**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **GOLDEN COUNTY FOODS, INC.,** | § | **CASE NO. 15-11062** |
| ***et al.,***[1] | § | |
| | § | **JOINT ADMINISTRATION** |
| **DEBTORS** | § | **REQUESTED** |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS**
**AUTHORIZING DEBTOR-IN-POSSESSION FINANCING**
**AND GRANTING RELATED RELIEF**

Golden County Foods, Inc. ("GCF"), GCF Holdings II, Inc. ("GCF Holdings"), and GCF

Franchisee, Inc. ("GCF Franchisee" and collectively, the "Debtors"), as debtors and debtors-in-

possession, file this motion (the "Motion") pursuant to sections 105, 362, 363, 364 of the

Bankruptcy Code[2] to request the entry of interim and final orders (i) authorizing the Debtors

to obtain debtor-in-possession financing, (ii) granting postpetition security interests and

according priority administrative expense status pursuant to sections 364(c) and (d) of the

Bankruptcy Code, (iii) authorizing the use of cash collateral, (iv) granting adequate

protection, (v) modifying the automatic stay, and (vi) and granting related relief, and in

support state as follows:

**I. BACKGROUND**

1.    On May 15, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for

relief under Chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their

property and are operating their businesses as debtors-in-possession in accordance with sections

1107 and 1108 of the Bankruptcy Code.  A detailed description of the Debtors' business, capital

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Golden County Foods, Inc. (3018); GCF Franchisee, Inc. (4385), and GCF Holdings II, Inc. (3151).  The address of the Debtors' corporate headquarters is 300 Moore Road, Plover, Wisconsin 54467.
[2] 11 U.S.C. §§ 101, et seq.  Unless otherwise noted, all statutory references are to the Bankruptcy Code.

structure, and the events leading to the Debtors' bankruptcy is set forth in the Declaration of James J. Bradford in Support of Certain First Day Pleadings (the "First Day Declaration") filed concurrently with this Motion and is incorporated herein by reference.

## II. RELIEF REQUESTED

2.      GCF has an urgent and immediate need for cash to continue to operate.[3] Currently, GCF does not have sufficient funds to operate without an overadvance under its prepetition credit facility.  Absent authorization from the Court to obtain additional financing, GCF will be forced to immediately cease operations and liquidate its assets, not only destroying its going-concern value but also resulting in the loss of approximately 500 jobs at the Debtors' headquarters in Plover, Wisconsin.  Concurrently with this Motion, GCF has filed a motion (the "Bid Procedures Motion") to request the entry of an order establishing procedures for a competitive bidding and auction process for the sale of substantially all of the assets of GCF. The Bid Procedures Motion contemplates that a sale of GCF's assets will be consummated no later than July 14, 2015.  Without additional financing, GCF will be unable to operate long enough to consummate the sale.  The debtor-in-possession financing requested in this Motion will enable GCF to continue operating through the closing of the proposed sale, maximizing the value of GCF's estate by preserving GCF's value as a going concern.

3.      By this Motion, the Debtors request entry of interim (the "Interim Order") and final orders (the "Final Order") authorizing the Debtors to obtain postpetition financing pursuant to sections 105, 362, 364(c)(1)-(3), 364(d), and 507 of the Bankruptcy Code (the "DIP Financing").  In summary, the Debtors request that the Court authorize the Debtors to obtain senior secured, postpetition financing up to an aggregate principal amount of up to $12,750,000

---

[3] GCF Holdings is a non-operating holding company that owns the equity in GCF.  Although GCF Holdings does not operate, for the reasons discussed below it is a guarantor under the proposed DIP Loan Agreement (defined below).

(the "DIP Facility") pursuant to the terms of the Senior Secured Superpriority Debtor-in-Possession Revolving Credit, Term Loan, and Security Agreement (the "DIP Loan Agreement"), substantially in the form attached hereto as **Exhibit A**, by and between the Debtors and PNC Bank, National Association (the "PNC"), as agent for the lender under the DIP Loan Agreement (the "DIP Lender").

4.    The Debtors also request approval to grant the DIP Lender senior postpetition security interests and a superpriority administrative expense claim under sections 364(c) and (d) for amounts advanced under the DIP Facility, subject to a carve-out for United States Trustee fees, fees of the Debtors' professionals, and fees of the professionals of any official committee of unsecured creditors (the "Carve-Out").  In addition, the Debtors request approval of the use of cash collateral as set forth below, authority to grant the DIP Lender adequate protection, and modification of the automatic stay on a limited basis to effect the terms and conditions of the DIP Financing.

5.    The DIP Financing will permit GCF to continue operating until at least July 14, 2015, by which time GCF will have closed on the sale of its assets to the highest bidder. Without the DIP Financing, the GCF will not be able to operate long enough to conclude the sale, and will be forced to cease its operations and convert this case to chapter 7.  Accordingly, the Debtors request interim and final approval of the DIP Financing on the terms set forth in the DIP Loan Agreement.  A proposed Interim Order is attached hereto as **Exhibit B**.  The amounts to be advanced under the DIP Facility on an interim basis will be limited to those necessary expenses, reflected in the interim budget (the "Interim Budget") attached as **Exhibit C** hereto, in an amount not to exceed $2,409,000.  The Debtors request that the Court schedule a final hearing (the "Final Hearing") to consider the DIP Financing on or before June 9, 2015.

### III. THE PROPOSED DIP FINANCING

**A.    The Debtors' Prepetition Indebtedness**

6.      The Debtors are indebted to PNC under the terms of a Revolving Credit, Term Loan and Security Agreement, dated as of November 13, 2013 (the "Prepetition Credit Agreement").  As amended, the Prepetition Credit Agreement provides for a revolving credit advances of up to $12,750,000 (the "Revolving Advances"), first out term loans of $10,000,000 (the "First Out Term Loans"), and a last out term loans of $12,500,000 (the "Last Out Term Loans").  As of the Petition Date, there was approximately $21,527,982.89 due and owing under the Prepetition Credit Agreement, consisting of approximately $7,303,063.91 in Revolving Advances, $5,690,476.18 in First Out Term Loan, and $8,534,442.80 in Last Out Term Loans. The amounts borrowed under the Credit Agreement were used to fund the Debtors' general working capital requirements.

7.      The amounts owed under the Prepetition Credit Agreement are secured by senior liens (the "Prepetition Senior Liens") on all of the Debtors' assets, including the following: (i) receivables; (ii) equipment; (iii) general intangibles; (iv) inventory; (v) real property; (vi) investment property; (vii) leasehold interests; (viii) contract rights; and (ix) all proceeds and products of the foregoing (collectively the "Prepetition Collateral").

**B.    Debtors' Search for Alternate Sources of Financing**

8.      As described more fully in the First Day Declaration, GCF is in significant financial distress and is in default under the Prepetition Credit Agreement.  Beginning in December 2014, the Debtors contacted multiple parties to seek the additional financing necessary for the Debtors to continue as a going concern but were unsuccessful.  In February 2015, GCF retained Piper Jaffray & Co. ("Piper Jaffray") to assist GCF in evaluating its strategic alternatives, including a refinancing or sale of GCF's operations.  Beginning in late February,

Piper Jaffray contacted 128 parties, 27 of which were potential sources of financing and 101 of which were potential purchasers.    Sixty-three of those contacted responded to receive a confidential information memorandum.    Of the 63, 51 were potential purchasers and 12 were potential sources of financing.    After varying degrees of due diligence, 6 parties submitted initial indications of interest expressing interest in purchasing GCF's assets.    None of the parties were willing to provide financing.

9.    Having been turned down by at least 27 potential sources of financing, the Debtors do not believe that there are any parties willing to provide financing on terms more favorable than those contained in the DIP Loan Agreement, including financing in the form of unsecured credit allowable under section 503(b)(1) or as an administrative expense under section 364(a) or (b).

## C.    The Proposed DIP Financing

10.    The Debtors and the DIP Lender negotiated the terms and conditions of the DIP Financing at arms' length over the course of several weeks.    The DIP Financing will be provided under the terms of the DIP Loan Agreement via an amendment to the Prepetition Credit Agreement.    The material terms of the DIP Financing are set forth below.

| Borrowers: | Golden County Foods, Inc. and GCF Franchisee, Inc. (together, the "**Borrower Debtors**"). |
|---|---|
| Guarantors: | GCF Holdings II, Inc. (the "**Guarantor Debtor**" and collectively with the Borrower Debtors, the "**Debtor**"), Golden County Foods Holdings, Inc., and Brazos Equity Fund II, L.P. |
| Amount and Type of Facility: | After entry of the Final Order, the DIP Facility will consist of: a revolving credit line of up to $12,750,000 (the "**Maximum Revolving Advance Amount**") at any one time outstanding, inclusive of any amounts outstanding under the revolving credit line under the Pre-Petition Credit Agreement (the "**DIP Revolving Facility**") and a roll-up of the pre-petition First Out Term Loan. |

| | |
|---|---|
| **Agent:** | PNC Bank, National Association ("**PNC**"). |
| **DIP Lender:** | PNC Bank, National Association (the "**DIP Lender**"). |
| **Borrowing Availability:**<br><br>*DIP Loan Agreement §§ 1.2, 2.1* | Availability calculated as follows: The lesser of (x) the Maximum Revolving Advance Amount, less the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit or (y) the Formula Amount, plus the Overadvance Amount (defined below) shall be made available to Borrowers from the date of the entry of the Interim Order (as defined below) until the date of the entry of the Final Order, subject to and as limited by the Interim Budget.<br><br>The availability under the DIP Revolving Facility shall be reduced by reserves as may be established by PNC in its reasonable discretion from time to time to reflect, among other things, contingencies or risks that may materially affect the DIP Collateral, the liens of PNC, in such DIP Collateral or the business and operations of the Debtor, including, without limitation, a reserve for the Carve-Out.<br><br>"**Overadvance Amount**"  shall mean, the following amounts on the following dates, unless (a) PNC has agreed to a higher amount as determined by PNC in its sole discretion (but in no event shall such amount exceed $4,000,000) or (b) the Termination Date shall have occurred before any such date:<br><br>    from the Petition Date through the day that is sixteen (16) days after the Petition Date, $2,042,000;<br><br>    from the seventeenth (17th) day after the Petition Date through the day that is twenty-three (23) days after the Petition Date, $2,409,000;<br><br>    from the twenty-fourth (24th) day after the Petition Date through the day that is thirty (30) days after the Petition Date: $2,691,000; and<br><br>    from the thirty-first (31st) day after the Petition Date through the day that is forty-four (44) days after the Petition Date: $3,375,000; and<br><br>    from the forty-fifth (45th) day after the Petition Date through the day that is sixty (60) days after the Petition Date:  $4,000,000. |
| **Carve Out:** | The  DIP  Credit  Liens,  DIP  Superpriority  Claims, |

| | |
|---|---|
| *Interim Order at ¶ 12* | Prepetition Adequate Protection Liens, and Prepetition Adequate Protection Claim shall be subject only to right of payment of the following expenses: (a) unpaid postpetition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930; (b) unpaid postpetition fees and expenses of professionals of the Debtors and professionals of a Statutory Committee (if any); and (c) postpetition fees and expenses of the Professionals incurred after the occurrence of a Termination Event in an aggregate amount not to exceed $50,000, to the extent such fees and expenses are (i) subsequently allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code, and (ii) not otherwise paid from retainers or any professional expense escrow account established by the Debtors;<br><br>The aggregate amount of the Carve-Out Amounts shall not exceed $1,000,000 (exclusive of any fee payable to Piper Jaffray)). |
| **Budget and Variances:**<br><br>*DIP Loan Agreement § 7.23* | Actual amounts for (i) total cash receipts and cash disbursements from operations line items (which shall not include any Professional Fees) may not vary from the applicable Budget more than fifteen percent (15%) for each week during any Budget period or ten percent (10%) on a cumulative basis for that portion of the Budget period then ended, and (ii) with respect to Professional Fees, the Borrowers may vary from the applicable Budget by no more than fifteen percent (15%) on a cumulative basis per Professional Fee line item for that portion of the Budget period then ending (and each professional that may receive Professional Fees shall be reflected on its own Budget line item) (collectively, the "**Budget Variances**"). |
| **Facility Fees:**<br><br>*DIP Loan Agreement § 3.3* | Borrowers to pay PNC a non-refundable, fully earned DIP Commitment Fee of $75,000. |
| **Termination Date:**<br><br>*DIP Loan Agreement § 1.2* | The earliest to occur of: (a) 60 days after the Petition Date (the "**Maturity Date**"); (b) twenty-five (25) days after the Petition Date (as defined below) if the Final Order has not been entered; (c) acceleration of the obligations under the DIP Facility; (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility or is otherwise acceptable to PNC; (e) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; (f) the entry of an order by the Bankruptcy Court (as defined below) granting |

| | |
|---|---|
| | (i) relief from the automatic stay permitting foreclosure of any assets of any Debtor with a value in excess of $100,000 in the aggregate, (ii) any motion by PNC to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) a motion or other pleading requesting (or entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers, or (iv) approving motion for the dismissal or conversion of the Chapter 11 Case (as defined below); (g) the filing or support by any Debtor of a plan of reorganization that does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility; and (h) such other date as is agreed to in the DIP Financing Documents. The date on which the earliest of clauses (a) through (h) above occurs being referred to hereinafter as the "**Termination Date**." On the Termination Date, the DIP Facility shall be deemed terminated, and PNC shall have no further obligation to provide financing pursuant to the DIP Facility or DIP Financing Documents. |
| **Interest Rate and Payment Terms:** <br><br> *DIP Loan Agreement §§ 1.2, 3.1* | Interest shall be paid monthly on all outstanding advances under the DIP Facility at a per annum floating rate equal to the sum of (a) the Base Rate (as defined in the Pre-Petition Credit Agreement), plus (b) 3.25%.  Interest on the postpetition First Out Term Loan will accrue at the same rate applicable to the prepetition First Out Term Loan. Each of the interest rates set forth above shall constitute the applicable "**Non-Default Interest Rate**". <br><br> Effective immediately upon the occurrence of an Event of Default unless waived in writing PNC, interest on the outstanding loans under the DIP Facility shall accrue at a rate that is 2% per annum in excess of the Non-Default Interest Rate. |
| **Use Of Proceeds:** <br><br> *DIP Loan Agreement § 2.21* | Proceeds of the DIP Facility shall be used solely for the following purposes (and to the extent identified in the Budget): (a) to fund post-petition operating expenses and working capital needs of the Borrowers, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees and expenses to PNC in accordance with the DIP Facility (whether or not such amounts are reflected in the Budget); (c) to fund fees and expenses incurred in connection with the 363 Sale (as defined below); (d) to pay permitted pre-petition claim payments and adequate protection payments, if any; (e) to |

| | |
|---|---|
| | pay professional fees and expenses; and (f) to pay certain other costs and expenses of administration of the Chapter 11 Case. |
| **Cash Management Collections and Remittances:**<br><br>*DIP Loan Agreement § 6.22* | Borrowers shall use a cash management system that is the same as or substantially similar to its pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to PNC. The Interim Order and Final Order shall provide the DIP Lender with a valid and enforceable first priority lien/security interest on the cash held in the Borrowers' bank accounts. |
| **Pre-Petition Obligations:**<br><br>*Interim Order at ¶ 5* | The Borrowers and the Guarantors owe certain obligations (collectively, the **"Pre-Petition Loans**," and holders of the Pre-Petition Loans shall be referred to as the **"Pre-Petition Lenders"**) under that certain Revolving Credit, Term Loan and Security Agreement dated as of November 13, 2013 among GOLDEN COUNTY FOODS, INC., GCF FRANCHISEE, INC., collectively, the **"Pre-Petition Borrowers"**, and each a **"Pre-Petition Borrower"**), the financial institutions which are now or which hereafter become a party hereto (collectively, the **"Pre-Petition Lenders"** and each individually a **"Pre-Petition Lender"**) and PNC BANK, NATIONAL ASSOCIATION, as agent for Lenders (PNC, in such capacity, the **"Pre-Petition Agent"**) (the **"Pre-Petition Credit Facility"**).   Prior to entry of the Final Order, the Revolving Advances under the Pre-Petition Credit Facility shall be subject to a "creeping" rollup.  Upon entry of the Final Order, the Debtors' obligations to PNC under the Pre-Petition Credit Facility (other than obligations relating to the Last Out Term Loan, as such term is defined in the Pre-Petition Credit Facility) shall be deemed obligations under the DIP Facility, and all obligations of any Guarantor under the Pre-Petition Credit Facility shall be reaffirmed and/or remain in place as to the DIP Facility. |
| **Super-Priority Administrative Claim:**<br><br>*Interim Order at ¶ 3* | Subject to the Carve-Out, amounts owed by Borrowers to PNC pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code. |
| **Collateral Security:**<br><br>*Interim Order at ¶ 6* | Subject to the Carve-Out, the DIP Facility (including accrued interest, fees, costs and expenses) shall be secured, subject and subordinate to any valid, perfected prior liens |

| | |
|---|---|
| | and security interests existing as of the Petition Dates other than those in favor of the Pre-Petition Lenders, by first priority senior and priming liens and security interests (the "**DIP Liens**") in all of the Borrowers' property, including, without limitation, all of Borrowers' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Borrowers (collectively, the "**DIP Collateral**"); provided, however, DIP Collateral shall not include any avoidance actions relating to prepetition transfers available to the bankruptcy estate of any Debtor pursuant to the Bankruptcy Code. |
| **Lien Validation and Perfection:**<br><br>*Interim Order at ¶¶, 11 23* | All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected as of the applicable Petition Dates, and no further filing, notice or act will be required to effect such perfection.<br><br>The Debtor shall stipulate in the Interim Order and Final Order that (i) PNC's liens securing the Pre-Petition Credit Facility are valid, perfected and have first priority, and such liens encumber all assets of the Debtor, and (ii) the Debtor possesses no claims, offsets or any other type cause of action against PNC which would impair, in any manner, PNC's liens against the Debtors' assets or the Obligations of the Debtor to PNC under the Pre-Petition Credit Facility. The Debtors' stipulation shall be binding upon all parties in interest in the Chapter 11 Case, including any committee that is appointed, unless (i) an adversary proceeding is filed prior to the expiration of the later of (i) seventy-five (75) calendar days from the Petition Date or (ii) sixty (60) days from the date on which a Committee is formed; provided that such periods in clauses (i) and (ii) may be shortened forty-five (45) days after the Petition Date with the consent of the Committee (the "**Review Period**") against PNC challenging PNC's liens or otherwise asserting estate claims against PNC, and (ii) a final judgment is entered against PNC in such adversary proceeding; provided, however, any party-in-interest that fails to file an adversary proceeding within the Review |

| | |
|---|---|
| | Period shall be forever barred from asserting any claims against PNC on behalf of the Debtors' estate, or challenging in any manner PNC's liens and claims against the Debtor. |
| **Release of Claims**<br><br>*Interim Order at ¶ 24* | In consideration of the furnishing of the DIP Facility, the Debtors, subject to the rights of another party to bring a Challenge Action during the Review Period, shall absolutely release and forever discharge each of the Pre-Petition Agent and Pre-Petition Lenders and their affiliates, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that the Debtors may hold against such released parties. |
| **506(c) Surcharge**<br><br>*Interim Order at ¶ 14* | Subject to entry of the Final Order, the Debtors shall waive any right to surcharge the prepetition collateral or DIP Collateral, whether pursuant to Bankruptcy Code sections 506(c) or 105(a) or under any other applicable law. |
| **Adequate Protection:**<br><br>*Interim Order at ¶ 9* | Prior to entry of the Final Order, as adequate protection and in consideration for being primed by the DIP Lender's' claims and liens, the Pre-Petition Lenders (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, except allowed claims paid under the Carve-Out and super-priority administrative claims of the DIP Lender under the DIP Facility; and (b) shall have valid, binding, enforceable and perfected liens in all DIP Collateral, subject to the DIP Liens and Carve-Out, in each case equal to the sum of the aggregate diminution, if any, subsequent to the applicable Petition Dates, in the value of their respective pre-petition collateral (the "**Adequate Protection Liens**"). |
| **Affirmative and Negative Covenants:**<br><br>*DIP Loan Agreement §§ 6, 7* | Affirmative and negative covenants customarily included in debtor-in-possession financing agreements, including, but not limited to, (a) customary and reasonable reporting requirements as reasonably required by PNC in its sole discretion, (b) compliance with Budget covenants consistent with the section titled "Budget and Variances," together with any additional covenants appropriate in the context of the DIP Facility as reasonably required by PNC in its sole discretion, (c) the Debtor shall, from and after the Petition Date, continue to take action and demonstrate progress, satisfactory to PNC in PNC's Credit Judgment, toward closing a sale of substantially all of the Debtors' assets to the stalking horse bidder (or, as applicable, the Winning Bidder) in accordance with the Milestones and shall demonstrate progress toward, and work to satisfy, all |

| | |
|---|---|
| | proposed sale conditions imposed in the stalking horse bidder's (or Winning Bidder's) asset purchase agreement; and (d) the Debtor shall, contemporaneously with closing a sale of substantially of all of its assets, remit the proceeds of such sale to the Agent for immediate application to the Obligations in accordance with the DIP Financing Documents.<br><br>The Debtor shall conduct a sale process for the sale of substantially all of the assets of the Debtor in accordance with the Milestones defined below. Current Management, together with Piper Jaffray, Neligan Foley, and the Debtors' other professionals, shall oversee the sale process on behalf of the Debtor, including all activities of any advisors retained by the Debtor in connection with the sale process, shall at all times be entitled to take any action necessary or appropriate to conduct the sale process, and shall provide PNC with access to all potential bidders and other interested parties, and any information provided to the Debtor by such parties. |
| **Sale Process:**<br><br>*DIP Loan Agreement § 6.19* | <u>Milestones</u>. The Debtor shall be required to comply with the following (the "**Milestones**"):<br><br>(a) On the Petition Date or such later date to which PNC consents in writing in its sole discretion, the Debtor shall file a motion requesting entry of the Sale Procedure Order (as defined below) and select a "Stalking Horse" bidder on terms and conditions acceptable to PNC.<br><br>(b) On or before the date that is thirty (30) days after the Petition Date, or such later date to which PNC consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Procedure Order.<br><br>(c) On or before the date that is fifty (50) days after the Petition Date, or such later date to which PNC consents in writing in its sole discretion, the Debtor shall have held the Auction (as defined below).<br><br>(d) On or before the date that is fifty-seven (57) days after the Petition Date, or such later date to which PNC consents in writing in its sole discretion, the Bankruptcy Court shall |

|  |  |
|---|---|
|  | have entered the Sale Order (as defined below) approving the 363 Sale, the results of the Auction and the winning bid received at the Auction.<br><br>(e) On or before the date that is three (3) days after entry of the Sale Order, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or such later date to which PNC consents in writing in its sole discretion, the Sale shall be closed, with proceeds of the Sale paid directly to PNC to be applied to the obligations under the DIP Facility. |
| **Additional Conditions to Each Borrowing Under the Facility:**<br><br>*DIP Loan Agreement § 6.25* | PNC shall, in its Credit Judgment, be satisfied that Debtor is continuing to take action and demonstrating progress toward closing a sale of substantially all of the Debtors' assets in accordance with the Milestones to the stalking horse bidder (or, as applicable, the Winning Bidder) and is working toward satisfying all proposed sale conditions imposed in the stalking horse bidder's (or Winning Bidder's) asset purchase agreement. |
| **Remedies:**<br><br>*DIP Loan Agreement § 11* | Upon the Termination Date, PNC shall have customary remedies, including, without limitation, the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court; provided, however, that PNC shall provide Borrowers with five (5) days written notice of PNC's intent to exercise such remedies and subject to the right of the Debtors or any committee appointed by the Bankruptcy Court to seek an injunction, provided, further, however, no such notice shall be required for, and nothing herein shall impair or restrict PNC's rights regarding: (i) the termination of further DIP Facility advances following the occurrence of an Event of Default, the termination of the Debtors' use of DIP Collateral following an Event of Default, or the right to demand for repayment of the outstanding DIP Facility obligations following an Event of Default; or (ii) the collection and application of proceeds remitted to one or more lockbox accounts, controlled accounts, or other accounts subject to PNC's control. Section 362 relief from the stay in favor of PNC shall be embodied in any order approving the DIP Facility and the use of cash collateral. |
| **Events of Default:**<br><br>*DIP Loan Agreement § 10* | Defaults and Events of Default customarily included in debtor-in-possession financing agreements, including, without limitation: |

The Debtor shall, without PNC's prior written consent, take any action that (or fail to take any action that could reasonably be expected to) results in any of Current Management ceasing to be employed by the Debtor or incurring a material change in job duties.

The Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been granted.

Filing or support of a proposed plan of reorganization by any Debtor that does not provide for the indefeasible payment in full and in cash of Borrowers' obligations outstanding under the DIP Facility.

Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization that does not require the indefeasible repayment in full, in cash of the DIP Facility as of the effective date of the plan.

Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of PNC, or the filing of any motion or other pleading requesting such relief which the Debtor fails to timely oppose.

Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of PNC, or the filing of a motion or other pleading requesting such relief which the Debtor fails to timely oppose.

Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility, without the prior written consent of PNC or the filing of a motion or other pleading requesting such relief which the Debtor fails to timely oppose.

Any attempt by any Debtor to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair PNC's claims (other than claims for post-

petition services by PNC's professionals subject to any objection period as set forth in the "Fees and Expenses" section above), or to subject any of PNC's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

Any Debtor shall apply for an order substituting any assets for all or any portion of the DIP Collateral, except as provided in the instruments evidencing and governing the DIP Facility.

Any payment on, or application for authority to pay, any pre-petition claim owing to terminated employees, lease rejection damages, other than those required to be paid with the DIP Facility pursuant to the terms of the DIP Facility, without prior written consent of PNC.

The Debtor shall, without PNC's prior written consent, take any action that (or fail to take any action that could reasonably be expected to) results in Piper Jaffray ceasing to be involved in the sale process or otherwise halts the sale process.

A final order is entered granting any creditor with a claim in excess of $100,000 relief from the automatic stay.

Failure to make all payments under the DIP Facility when due.

Failure to pay any material, undisputed post-petition indebtedness within 45 days of the date on which such indebtedness is due to be paid.

Breach of any covenant of the DIP Facility.

Any representation or warranty by any Debtor is incorrect in any material respect when made.

Exclusivity shall have been terminated or the Borrowers shall have agreed to any such termination.

After entry thereof, either of the Sale Procedure Order, the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or which shall have been modified or amended in a manner that materially and adversely affects PNC's rights with respect to repayment of the DIP Facility.

The "Stalking Horse" bidder designated in the motion seeking approval of the Sale Procedures Order shall drop out of the sale process or otherwise indicate that

| | |
|---|---|
| | it is unable to close the sale process within sixty (60) days of the Petition Date. |
| | Any Loan Party shall take (or support any other Person in taking) any action in order to restrict or prohibit Agent or Lenders from submitting a "credit bid" for any assets of the Borrowers or Guarantors. |
| | The Debtors fail to disburse the sale proceeds to the Lenders contemporaneously with the closing of a sale of all of their assets. |
| | The stalking horse bidder designated in the motion seeking approval of the Sale Order and Customer 1 shall fail to have entered into a supply agreement, satisfactory to the stalking horse bidder, within twenty (20) days after the Petition Date. |
| | Other customary Events of Default as may be reasonably required by PNC. |
| **Indemnification:**<br><br>*DIP Loan Agreement § 16.5* | The Borrowers shall indemnify and hold PNC and its officers, directors, employees and agents (including all of their professionals) (each an **"Indemnified Party"**) harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the Loan Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. |

11.    In accordance with Local Rule 4001-2, the following provisions of the DIP Loan

Agreement are highlighted:

12.    *Provisions or findings of fact that bind the estate or other parties in interest with*

*respect to the validity, perfection or amount of the secured creditor's prepetition lien or the*

*waiver of claims against the secured creditor without first giving parties in interest at least*

*seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least*

*sixty (60) days from the date of its formation to investigate.* Local Rule 4001-2(a)(i)(B).   The

stipulations and releases in the Interim Order are binding on all parties in interest subject to the

right of interested parties, including a statutory committee; provided, however, that parties in

interest shall have until the later of (i) seventy-five (75) calendar days from the Petition Date; or

(ii) sixty (60) days from the date on which a committee is formed, to commence an adversary

proceeding against the DIP Lender.   Interim Order at ¶ 26.   The periods set forth in clauses (i)

and (ii) may be shortened to forty-five (45) days from the Petition Date with consent of the

Statutory Committee.   *Id.*

     13.    *Provisions that waive rights of the debtor's estate under section 506(c).*   Local

Rule 4001-2(a)(i)(C).   The Debtors' proposed waiver of section 506(c) rights will be effective

only after entry of the Final Order.   Interim Order at ¶ 14.

     14.    *Provisions that deem prepetition secured debt to be postpetition debt or*

*prepetition loans from a prepetition secured lender used to pay part or all of that secured*

*creditor's prepetition debt.*   Local Rule 4001-2(a)(i)(E).   Upon entry of the Final Order, the

Prepetition Obligations relating to Prepetition Revolving Advances (as defined in the DIP Loan

Agreement) and First Out Term Loans (as defined in the DIP Loan Agreement) shall become

Obligations under the DIP Credit Agreement.   Interim Order at ¶ 5.   Following entry of the

Interim Order, cash proceeds received by the DIP Lender will be applied first to outstanding,

prepetition revolving loan obligations. DIP Loan Agreement at § 2.8.

     15.    *Provisions that seek to affect the Court's power to consider the equities of the*

*case under 11 U.S.C. § 552(b)(1).*   Local Rule 4001-2(a)(i)(H).   Subject to entry of the Final

Order, the DIP Lender shall not be subject to the "equities of the case" exception of section

552(b), or to the equitable doctrines of "marshaling" or any similar claim or doctrine.  Interim Order at ¶ 14.

16.     The Debtors and the DIP Lender have agreed upon the Interim Budget attached hereto as **Exhibit C**, which reflects the Debtors' operating expenses through July 14, 2015.  The Debtors anticipate agreeing with the DIP Lender on a final budget (the "<u>Final Budget</u>") prior to the time of the Final Hearing.

## IV. BASIS FOR RELIEF

**A.     The DIP Financing Should Be Approved**

17.     Approval of the DIP Financing on the terms set forth in the DIP Loan Agreement will provide GCF with immediate access to funds necessary to pay current and ongoing operating expenses, including postpetition wages, utility payments, and payments to vendors.  Without access to sufficient funds to pay these costs, GCF will be forced to immediately cease operations and terminate all of its employees, destroying the GCF's value as a going concern and severely harming GCF's approximately 500 employees.  The DIP Financing is necessary in order to preserve the value of the Debtors' estates and to avoid the harm that would result from the termination and piecemeal liquidation of GCF's operations.

18.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).  The Debtors propose to obtain the DIP Financing as set forth in

the DIP Loan Agreement by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2) and (3) of the Bankruptcy Code.

19.    To obtain financing under section 364(c), a debtor must show that (i) it is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender only an administrative claim); (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.  *In re Aqua Associates*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); *In re Course Group, Inc*., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  As set forth above, the Debtors have not been able to obtain unsecured credit or DIP financing on better terms than those reflected in the DIP Loan Agreement.  Further, the DIP Financing is necessary to preserve the going-concern value of the Debtors' estates because, absent additional financing, GCF will be forced to cease operations and liquidate its assets in piecemeal fashion.  Finally, the terms of the DIP Financing were negotiated at arms' length and are fair and reasonable under the circumstances.

20.    As noted above, the DIP Lender provided prepetition secured credit to the Debtors under the terms of the Prepetition Credit Agreement.  The DIP Loan Agreement will be structured as an amendment to the Prepetition Credit Agreement.  Under the terms of the DIP Loan Agreement, a portion of the DIP Lender's prepetition secured claim will be paid off by the DIP Facility, effectively converting the DIP Lender's prepetition claim into a postpetition administrative claim.  Specifically, the Revolving Advances and First Out Term Loans will be converted into postpetition indebtedness.[4]

21.    Such payments, known as a "roll-up," are "routinely made" in the context of DIP financing.  *In re Energy Fut. Hold. Corp*., 2015 WL 729666, *7 (D. Del. Feb. 19, 2015) (quoting

---

[4] The Last Out Term Loans will not be converted to postpetition debt and will remain as prepetition secured claims.

*In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 510–11 (Bankr. D. Del. 2010)).    As the district court recently observed,

> Prepetition secured claims can be paid off through a 'roll-up.' Most simply, a roll up is the payment of a pre-petition debt with the proceeds of a post-petition loan. Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor. As a result, the entirety of the pre-petition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order.

*Id*. (quoting *Capmark Fin. Grp., Inc*., 438 B.R. at 510–11).    GCF does not currently have sufficient cash flow or liquidity to fund its operations and the Debtors have not been able to obtain DIP financing on more favorable terms.    After several weeks of arms' length negotiation with the DIP Lender, the Debtors believe in the exercise of their business judgment that the terms of the DIP Financing, including the roll-up of the DIP Lender's prepetition claim, are fair and reasonable and are the most favorable terms the Debtors could obtain under the circumstances.   *See In re AMR Corp*., 485 B.R. 279, 289 (Bankr. S.D.N.Y. 2013) (courts should defer to debtors' business judgment when determining whether to approve financing under section 364).    Accordingly, the Debtors request that the DIP Financing be approved on the terms set forth in the DIP Loan Agreement under section 364(c).

**B.     The Debtors Should be Authorized to Grant the DIP Lender Superpriority Administrative Expense Claim and Postpetition Liens Under Sections 364(c) and (d)**

22.    Section 364(c) permits a debtor to grant a DIP lender a superpriority administrative claim and postpetition liens on the debtor's property.  The DIP Loan Agreement and Interim Order grant the DIP Lender a superpriority administrative expense claim with priority over all other administrative expenses under sections 503(b) or 507(b), subject only to the Carve-Out, in accordance with section 364(c)(1).  The DIP Loan Agreement also grants the

DIP Lender a postpetition lien (the "<u>DIP Lien</u>") on all of the Debtors' unencumbered assets (the "<u>DIP Collateral</u>"), *excluding* any causes of action under Chapter 5 of the Bankruptcy Code, subject to section 364(c)(2). The DIP Loan Agreement provides that the DIP Lien shall be junior to (a) the Carve-Out and (b) any valid, enforceable, properly perfected and unavoidable prepetition lien that is senior to the Prepetition Senior Liens in accordance with section 364(c)(3). As set forth above, the Debtors have demonstrated that the DIP Financing should be approved under section 364(c). Because the Debtors have satisfied the requirements of section 364(c), the Court should approve the superpriority administrative claim and DIP Liens provided to the DIP Lender under the DIP Loan Agreement.

23. Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the Court may only authorize incurring debt secured by such liens if, *inter alia*, "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d). However, consent by the secured creditors to a priming lien can obviate the need to show adequate protection. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

24. Here, the advances under the DIP Loan Agreement will be secured by a postpetition lien on the Debtors' assets (excluded Chapter 5 causes of action). Because the DIP Lender has consented to the priming as provided in the Interim and Final Order, the DIP Lender is adequately protected as required by section 364(d). *Id*.

**C.    The Debtors Should be Authorized to Use Cash Collateral and the DIP Lender Should be Granted Adequate Protection**

25.    As set forth above, the DIP Lender holds Prepetition Senior Liens, including rents, income, profits, cash, and proceeds, which constitute cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").  Section 363(c)(2) provides that a debtor may not use cash collateral unless each entity that has an interest in the cash collateral consents or the court, after notice and a hearing, authorizes the debtor's use of cash collateral. The DIP Lender has consented to the Debtors' use of the Cash Collateral in accordance with the Interim and Final Budgets on the terms set forth in the DIP Loan Agreement and subject to the terms of the Interim and Final Orders.  Accordingly, the Court should authorize the Debtors' use of Cash Collateral in accordance with the Interim and Final Budgets subject to the terms of the Interim and Final Orders.

26.    Under section 363(e), the Court may condition the use of collateral as necessary to provide adequate protection of a party's interest in the collateral.  Adequate protection is not defined in the Bankruptcy Code, but section 361 provides three non-exclusive methods as examples: (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest. 11 U.S.C. § 361; *In re Hari Ram, Inc.*, 507 B.R. 114, 120 (Bankr. M.D. Pa. 2014).  The DIP Lender has conditioned its consent to the use of the Prepetition Collateral and Cash Collateral on the provision of replacement liens on the DIP Collateral to the extent of any diminution in value in the Prepetition Collateral.

**D.    The Automatic Stay Should be Modified on a Limited Basis**

27.    The DIP Loan Agreement and the relief requested herein contemplates a modification of the automatic stay to the extent necessary to permit the Debtors to grant the

security interests, liens and superpriority claims described above and to allow the Debtors and the DIP Lender to perform such acts as may be necessary or desirable to perfect such interests and liens. The DIP Loan Agreement also provides for a modification of the automatic stay in the case of an Event of Default (as defined in the DIP Loan Agreement) to permit the DIP Lender to exercise its remedies. Specifically, the Interim DIP Order provides that with respect to most Events of Defaults, after the occurrence and during the continuation of any Event of Default, and after (a) DIP Lender's written notice of such breach to the Debtors and (b) the Debtors' failure to cure any such breach within five (5) business days of such written, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the Interim Order and the DIP Loan Agreement without further order of the Court.

28.    Stay modifications of this kind are ordinary and standard features of postpetition financing facilities, and the requirement that the DIP Lender give five (5) business days' notice before it is permitted to exercise its rights and remedies will provide the Debtors and other parties in interest the opportunity to challenge any alleged Event of Default. Consequently, the Debtors submit that the proposed modification to the automatic stay is both reasonable and fair under the circumstances, and should be approved

## E.    Interim Relief is Necessary to Avoid Immediate and Irreparable Harm to the Debtors' Estates

29.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. The Debtors request that the Court conduct an expedited preliminary hearing on this Motion to approve the DIP Facility on an

interim basis, pending entry of a final order, in order to maintain and finance the Debtors' ongoing operations.

30.     As discussed above, the Debtors have an urgent and immediate need for cash to continue to operate.  GCF does not have sufficient funds with which to operate its business on an ongoing basis and, specifically, to meet postpetition operating expenses, including payroll obligations on May 22, 2015.  Absent immediate authorization from the Court to obtain secured credit on an interim basis, the GCF will be forced to cease operations.  Expedited consideration of the Motion and interim approval of the DIP Financing will enable GCF to continue operations pending the Final Hearing, preventing the immediate and irreparable harm that would occur if GCF were unable to continue operating.  Accordingly, the interim relief requested is critical to preserving and maintaining the Debtors' value as a going concern.

## V. NOTICE

31.     The Debtors will provide notice of this Motion to: (i) the United States Trustee, (ii) the Debtors' 20 largest unsecured creditors, (iii) secured creditors, and (iv) all parties entitled to notice under Local Rule 9013-1(m) (collectively the "Notice Parties").  As this Motion is seeking "first day" relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested and the urgency of the circumstances surrounding this Motion, no other or further notice need be given.

# VI.  CONCLUSION

Accordingly, the Debtors request that the Court enter an order (i) granting the relief requested in this Motion and (ii) awarding the Debtors any further relief the Court deems appropriate.

Dated:  May 18, 2015

Respectfully submitted,

*/s/ Tyler D. Semmelman*

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Tyler D. Semmelman (No. 5386)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:  collins@rlf.com
            heath@rlf.com
            semmelman@rlf.com

Patrick J. Neligan, Jr.
Texas Bar No. 14866000
pneligan@neliganlaw.com
John D. Gaither
Texas Bar No. 24055516
jgaither@neliganlaw.com
**NELIGAN FOLEY LLP**
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301

**PROPOSED COUNSEL FOR THE DEBTORS**