## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11** |
| | § | |
| **GOLDEN COUNTY FOODS, INC.,** | § | **CASE NO. 15-11062 (KG)** |
| *et al.*,[1] | § | |
| | § | **JOINT ADMINISTRATION** |
| **DEBTORS** | § | **REQUESTED** |

## DECLARATION OF JAMES J. BRADFORD
## IN SUPPORT OF CERTAIN FIRST DAY PLEADINGS

1.      My name is James J. Bradford.  I am an Independent Contractor whose scope of responsibilities include those of a Chief Financial Officer for Golden County Foods, Inc. ("GCF"), GCF Holdings II, Inc. ("GCF Holdings"), and GCF Franchisee, Inc. ("GCF Franchisee") (collectively the "Debtors"), the debtor-in-possession in the above-captioned bankruptcy case (the "Bankruptcy Case").  In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, books and records.

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code").[2]  The Debtors are operating their businesses and managing their properties as debtors in possession under sections 1107 and 1108.

3.      To enable the Debtors to minimize the adverse effects of the commencement of the Bankruptcy Case on its business, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion" or "Motion").  The First Day Motions seek relief intended to allow the Debtors to:  (a) retain the professionals needed to guide it

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Golden County Foods, Inc. (3018); GCF Franchisee, Inc. (4385), and GCF Holdings II, Inc. (3151).  The address of the Debtors' corporate headquarters is 300 Moore Road, Plover, Wisconsin 54467.
[2] All of the statutory references contained in this Declaration will be to the Bankruptcy Code, unless otherwise indicated.

through its chapter 11 Bankruptcy Case and (b) perform and meet those obligations necessary to fulfill its duties as a debtor-in-possession in the chapter 11 Bankruptcy Case.  I am familiar with the contents of each of the First Day Motions (including the exhibits thereto), and I believe that the relief sought in each of the First Day Motions:  (a) is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estate and creditors' interests.

4.    I submit this Declaration in support of the First Day Motions.  Except as otherwise indicated, all of the facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, or information supplied to me by other members of the Debtors' management and the Debtors' professionals.  I am authorized to submit this Declaration on behalf of the Debtors, and if called on to testify, I could and would testify competently to the facts set forth herein.

## I. THE DEBTORS' BUSINESS AND OPERATIONS

**A.    Overview of the Debtors' Business**

5.    Founded in 1991, GCF manufactures a wide variety of prepared foods, including frozen appetizers, snacks, breakfast items, and potato products.  In addition to manufacturing these products for third-parties, GCF also provides research and development services to assist customers in the development of new and innovative prepared food products.  GCF's customers include major food companies, restaurant chains, mass merchants, and retail grocers.  GCF is headquartered in Plover, Wisconsin, where it maintains two state of the art manufacturing facilities and employs over 500 team members.

6.    GCF is a wholly-owned subsidiary of GCF Holdings, a privately-held, held non-operating holding entity with no assets other than its interests in GCF.  As discussed below, GCF

Holdings is a guarantor of GCF's secured indebtedness.  GCF Franchisee is an affiliated entity that is a co-borrower on GCF's secured indebtedness.  Although GCF Franchisee was at one time an operating entity, it has ceased operations and no longer has any employees, operations, or assets.

**B.**    **Debtors' Prepetition Debt and Capital Structure**

7.    As part of a refinancing in 2013, the Debtors entered into a Revolving Credit, Term Loan and Security Agreement, dated as of November 13, 2013 (the "Credit Agreement"), with PNC Bank, National Association ("PNC"), as the agent for a syndicate of lenders (the "Lenders").  The Credit Agreement provided for a revolving credit line of up to $20,000,000 (the "Revolver"), a "first out" term loan of $10,000,000 (the "First Out Term Loan"), and a "last out" term loan of $12,500,000 (the "Last Out Term Loan").  The amounts owed under the Credit Agreement are secured by liens (the "Prepetition Senior Liens") on all of the Debtors' assets, including the following: (i) receivables; (ii) equipment; (iii) general intangibles; (iv) inventory; (v) real property; (vi) investment property; (vii) leasehold interests; (viii) contract rights; and (ix) all proceeds and products of the foregoing (collectively the "Collateral").  The amounts borrowed under the Credit Agreement were used to fund the Debtors' general working capital requirements.  As of the Petition Date, total amount due and owing under the Credit Agreement was approximately $21,500,000.

8.    The obligations under the Credit Agreement were guaranteed by GCF Holdings under the terms of a Guaranty, a Guaranty Security Agreement, and Pledge Agreement, all dated November 13, 2013 (collectively the "Guaranty"), between GCF Holdings and PNC on behalf of

the Lenders.[3]   The Guaranty is secured by, *inter alia*, a lien on GCF Holdings' stock in GCF. The obligations under the Credit Agreement were also partially guaranteed by non-debtor Brazos Equity Fund II, L.P. ("Brazos") under the terms of a Limited Guaranty (the "Limited Guaranty"), dated November 13, 2013, between Brazos and PNC on behalf of the Lenders in an amount not to exceed $12,500,000.   In connection with the Guaranty and subsequent amendments to the Credit Agreement, Brazos purchased an $8,000,000 participation in the Last Out Term Loan from PNC under the terms of a Last Out Participation Agreement dated August 29, 2014.   The effect of the Last Out Participation Agreement was to reduce Brazos's outstanding liability under the Guaranty to $4,500,000.

9.     The Debtors are also indebted to several lenders, including Brazos, under the terms of unsecured Senior Subordinated Notes dated November 13, 2013 (the "Subordinated Notes") in the face amount of $1,000,000.   The Subordinate Notes were issued in connection with the PNC refinancing in November 2013.   As of the Petition Date, the Debtor owed its trade creditors approximately $14,700,000.

## C.     Events Leading to the Debtors' Bankruptcy Filing

10.     At the time of the PNC refinancing in November 2013, the Debtors had recently been awarded a large contract to manufacture and package a new breakfast sandwich being introduced into the market.   The Debtors believed the contract would generate approximately $13 million to $15 million in annual revenue at high profit margins, which was built into the business projections used in the refinancing.   In general, new products require a significant amount of initial marketing investment in order to build awareness of the product and generate initial sales.   However, in January 2014, the customer reduced its marketing budget and

---

[3] The obligations under the credit agreement were also guaranteed by Golden County Foods Holdings, Inc., which owns 100% of the equity interests in GCF Franchisee.  Golden County Foods Holdings, Inc. is not a debtor in this proceeding.

announced that it was deferring the marketing launch of the new sandwich for 18 to 24 months. Without the customer's marketing support, sales of the sandwich remained very low. As a result, the Debtors failed to meet their initial sales forecast and began to suffer liquidity constraints.

11.    At the time, the Debtors were also producing branded breakfast products bearing the name of an international restaurant chain pursuant to the terms of a license agreement with the owner of the brand.[4] However, producing a branded product is a high cost business and did not easily fit within the Debtors' business model, which focuses largely on lower cost co-packaging and manufacturing for third-parties. For a variety of reasons, the branded business was not profitable. For example, the Debtors were not given license to produce the restaurant's core menu items, including pancakes, which limited consumer recognition and interest in the products. As a result, sales remained low.

12.    In April 2014, the Debtors were awarded a contract to manufacture a number of frozen appetizer products sold by a large, multinational food company ("Customer No. 1"), which would translate into approximately $50 million to $60 million in annual revenue. However, the large production volume required the Debtors to make a substantial up-front working capital investment in order to obtain the necessary ingredients and materials, further constraining the Debtors' liquidity at the outset of the contract. In addition, after beginning production the Debtors were unable to obtain sufficient packaging materials for all of the product it was producing, necessitating a stop-start production process dictated by the availability of packaging materials. As a result, the Debtors were unable to produce finished products at its full capacity and suffered serious production inefficiencies. The Debtors' cash flow issues resulted in an event of default under the PNC Credit Agreement in the second quarter of 2014.

---

[4] The branded business was operated through GCF Franchisee.

13.     The Debtors took several steps to address the ongoing liquidity crisis, including ceasing GCF Franchisee's unprofitable branded business, reducing labor costs, and hiring new management with experience in turning around distressed food production companies.  Soon thereafter, however, Customer No. 1 altered the payment terms under its contract, stretching payment times from 45 to 90 days in violation of the parties' agreement.  Because sales to Customer No. 1 constituted approximately 50% of the Debtors' revenue, the change in payment terms had a significant adverse effect on the Debtors' cash flow, which in turn yielded substantial losses.  As a result of decreased cash flow, the Debtors were unable to buy all of the supplies it required to produce products for its customers, causing interruptions in the Debtors' manufacturing process and resulting in substantial inefficiencies.

14.     Unable to suffer continued losses, the Debtors gave notice of the breach of contract with the intent of terminating the Customer No. 1 contract in December 2014. Thereafter, the Debtors and Customer No. 1 negotiated a short-term amendment to the agreement, under which Customer No. 1 paid past-due invoices, reduced payment terms to 15 days, and purchased packaging and materials for the Debtors.  The short-term amendment has since been extended to July 31, 2015.  As a result of the amended contract, the Debtors were able to substantially reduce the amount outstanding under the PNC revolving credit facility. Nonetheless, the existing events of default under the Credit Agreement and PNC's concerns about the Debtors' ability to continue as a going concern caused led to a reduction in the Debtors' borrowing availability under the Revolver.  As a result, the Debtors continued to suffer liquidity constraints despite the amendments to the contract with Customer No. 1.

**D.     Prepetition Marketing Activities and Sale Agreement**

15.     In December 2014, the Debtors began approaching potential sources of financing seeking additional capital, including additional financing, to ensure that the Debtors could

continue as a going concern. However, the Debtors were unable to obtain any additional capital or financing. Accordingly, the Debtors retained Piper Jaffray & Co. ("Piper Jaffray") in early February 2015 to evaluate the Debtors' strategic alternatives and assist the Debtors in procuring new financing or selling their assets. Thereafter, Piper Jaffray contacted 128 parties to discuss the possibility of refinancing or purchasing the Debtors' assets, 27 of which were potential sources of financing and 101 of which were potential purchasers. Sixty-three of those contacted executed a non-disclosure agreement and received a memorandum describing the Debtors' business and the prospective opportunity. Fifty-one of the 63 were potential purchasers while the remaining 12 were potential sources of financing. Of those parties, 6 returned initial indications of interest expressing interest in purchasing the Debtors' assets. No parties expressed interest in a refinancing.

16.     Of the 6 initial indications of interest, the highest offer was submitted by Monogram Foods, a Memphis-based food manufacturer and co-packager who seeks to acquire the Debtors' assets and integrate the Debtors' operations into its own. Monogram conducted due diligence in late March and throughout the month of April. After approximately a month of intensive negotiation, the Debtors and Monogram reached an agreement for the sale of the Debtors' assets, which was memorialized in an Asset Purchase Agreement (the "APA"). The APA provides for the sale of substantially all of the assets of GCF to Monogram Appetizers, LLC ("Monogram") for a purchase price of $22 million.

17.     The Debtors initiated this bankruptcy case to facilitate the sale of its assets to Monogram under the APA. On the Petition Date, the Debtors filed a motion seeking authority to sell GCF's assets under the APA, subject to higher and better bids received in an auction process. The Debtors contemplate that the sale will be completed no later than 60 days after the Petition

Date.  As discussed more fully below, the Debtors have also filed a motion seeking approval of debtor-in-possession financing from PNC, which is necessary to enable the Debtors to continue operating long enough to consummate the sale.

18.     The Debtors do not have sufficient borrowing availability under the Credit Agreement to pay their operating expenses as they come due, including payroll.  Absent additional financing or a sale of its assets, the Debtors will be forced to immediately cease operations and liquidate their assets.  In addition to destroying the Debtors' value as a going concern, liquidation would result in the loss of nearly 500 jobs in Plover, Wisconsin, where the Debtors have been headquartered for nearly 25 years.  The sale of the Debtors' assets to the Stalking Horse Bidder, subject to higher and better offers received in a competitive bidding process, will enable the Debtors to avoid the immediate and irreparable harm that would occur if they were forced to cease operations while also preserving jobs and generating the highest possible price for the assets of the estate.

**E.      Rejection of the Collective Bargaining Agreement**

19.     Approximately 62% of the Debtors' workforce are members of the United Foods and Commercial Workers, Local 1473 (the "Union").  The Debtors' relationship with the Union and its members is governed by the terms of a Collective Bargaining Agreement dated August 1, 2013 (the "CBA").  Historically, the Debtors have provided a generous wage and benefits package to members of the Union.  For example, under the CBA the Debtors provide employees with group health, vision, and dental insurance plans, short- and long-term disability insurance.  The Debtors pay 80% of the cost of these plans and employees pay the remaining 20%.  In addition, the Debtors fund a healthcare reimbursement account (an "HRA") for each employee.  The Debtors fund the HRA with $1,000 annually for employees with single coverage and $2,000 annually for employees with family coverage.  The Debtors also contribute to a multi-employer

pension fund for Union members at a rate of $.425 per hour per member and matches 1% of participating employees' contributions to the Debtors' 401(k) program.  In general, the benefits provided under the CBA are well above market, far exceeding the benefits provided by similarly situated employers.

20.    The Debtors' obligations to employees, including the obligations imposed by the CBA, have contributed to the Debtors' financial difficulties.  Recognizing that, without a reduction in labor costs, the Debtors could not continue to operate, the Debtors' management approached the Union in February 2015 to discuss a modest reduction in the benefits provided under the CBA.  At the meeting, the Debtors provided detailed financial information, explained the necessity of a reduction in labor costs, and proposed a limited reduction in the benefits provided under the CBA.  The Debtors also explained that management and non-Union employees had recently taken an across-the-board pay cut of 5%.  Since the initial meeting, the Debtors have met with the Union on two additional occasions and arranged for a meeting between Monogram and the Union.  In proposing these concession to the Union, the Debtors hoped to facilitate a compromise between the Union and potential purchasers that would enable the Debtors to sell their assets to the highest bidder while minimizing the disruption to employees.  However, the Union categorically refused to agree to any concessions outside of a bankruptcy proceeding.

21.    Prior to completing its due diligence, Monogram was receptive to potentially assuming the Debtors' obligations under the CBA, provided that the Union would agree to the modest concessions requested by the Debtors, and met with the Union in April 2015 to discuss such an arrangement.  However, after completing its due diligence Monogram concluded that it

was unwilling to assume the CBA. As a result, termination of the CBA is a condition precedent to Monogram's obligation to close under the APA.

22.     Absent termination, the Debtors would be unable to consummate the sale and would be forced to cease operations and liquidate. The sale to Monogram will preserve jobs and minimize any interruption in their employment. In short, the Debtors there are no viable alternatives to termination of the CBA and, absent termination, all Union members' jobs will be lost. After the Petition Date, the Debtors plans to provide the Union with all necessary financial information to evaluate the Debtor's proposal and to meet with the Union in good faith to negotiate the proposed termination. If the Debtors are unable to reach an agreement with the Union, the Debtors will seek an order under section 1113 of the Bankruptcy Code terminating the CBA in order to preserve the value of the Debtors' estate and avoid a piecemeal liquidation.

## III. THE DEBTORS' FIRST DAY MOTIONS

### A.     Introduction

23.     In order to facilitate the transition into bankruptcy and minimize the adverse effects of the commencement of the Bankruptcy Case on its business, the Debtors have requested various types of relief in the First Day Motions, all of which are being filed concurrently with this Declaration. I submit this Declaration in support of the following First Day Motions:

a.     Motion for Authority to Continue Use of Existing Cash Management System, Maintain Existing Bank Accounts, and Continue Use of Existing Business Forms (the "Bank Account Motion") [Docket No. 6];

b.     Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective *Nunc Pro Tunc* as of the Petition Date (the "Claims Agent Motion") [Docket No. 5];

c.     Motion for Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (II) Approving Procedures for Providing Adequate Assurance of

Postpetition Payments, and (III) Approving Debtors' Proposed Form of Adequate Assurance (the "<u>Utility Motion</u>") [Docket No. 7];

d.  Debtors' Motion for an Order Directing the Joint Administration of Chapter 11 Cases (the "<u>Joint Administration Motion</u>") [Docket No. 4].

e.  Motion for Authority to Pay Pre-Petition Employee Wages and Compensation (the "<u>Wage Motion</u>") [Docket No. 8];

f.  Debtors' Emergency Motion for Interim and Final Orders Authorizing Debtor-in-Possession Financing and Granting Related Relief (the "<u>DIP Motion</u>") [Docket No. 9].

24.    I have reviewed each of the First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the relief sought in each of the First Day Motions:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations;  and (b) constitutes a critical element in achieving a successful reorganization of the Debtor.

**B.    The Bank Account Motion**

25.    In the ordinary course of business, the Debtors utilize a cash management system (the "<u>Cash Management System</u>") to collect and transfer the funds generated by the Debtors' operations and to disburse funds to satisfy the Debtors' financial obligations.  As part of the Cash Management System, the Debtors maintain two accounts at PNC:  an operating account and a zero balance collections/lockbox account (the "<u>Existing Bank Accounts</u>").  The Debtors' operations are funded by a revolving line of credit issued by PNC, which deposits funds drawn against the Debtors' line of credit into the operating account as requested by the Debtors.  All of the Debtors' operating expenses are paid from this operating account.  All of the Debtors' collections are deposited into the collections/lockbox account at PNC, which is swept daily.  The swept funds are applied against the amount owed by the Debtors on their line of credit.  This

Cash Management System is overseen and operated by the Debtors' financial personnel in Plover, Wisconsin.

26.    The Cash Management System and the existing Bank Accounts facilitate the Debtors' cash monitoring, forecasting and reporting, and enables the Debtors to efficiently collect, transfer, and disburse funds generated by its business operations.  Maintenance of the existing Cash Management System in the ordinary course of the Debtors' business will facilitate the Debtors' transition into bankruptcy and will avoid any unnecessary disruption to the Debtors' operations.  Maintaining the Existing Bank Accounts and designating them as a debtor-in-possession accounts will preserve business continuity and avoid the disruption to the Debtors' collection and disbursement procedures that would necessarily result from closing the Existing Bank Accounts and opening a new account.  Therefore, I believe it is in the best interest of the Debtors' estates that the relief requested in the Bank Account Motion be granted.

## C.    The Claims Agent Motion

27.    The Debtors anticipate that there will be in excess of 450 entities to be noticed in these chapter 11 cases.  In view of the number of anticipated parties in interest and the relative complexity of the Debtors' business, the Debtors submit that the employment and retention of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of the Debtors' estates and creditors, because the Debtors will be relieved of the burdens associated with the Claims and Noticing Services.  Accordingly, the Debtors will be able to devote their full attention and resources to maximize value for its stakeholders and facilitate the orderly administration of these chapter 11 cases.

28.    The Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and

reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.  The Debtors believe the retention of KCC is in the best interests of the Debtors, the Debtors' estates and all parties in interest.

**D.      The Utility Motion**

29.      In the ordinary course of business, the Debtors use gas, water, electric, telephone, and other utility services provided by various utility providers (collectively the "Utilities").  A list identifying each Utility currently providing service to the Debtors is attached to the Utility Motion as **Exhibit A**.  As with most businesses, uninterrupted utility services is critical to the Debtors' ability to maintain its ongoing operations.  This is especially true in this case.  As a manufacturer of food products, electricity, water, gas, waste disposal and other utility services are essential to the Debtors' operations.  Termination of services by the Utilities would preclude the Debtors from operating, resulting in significant losses and irreparable harm to the Debtors' estates.  The Debtors believe that the relief requested in the Utility Motion is necessary to prevent any potential disruption to the Debtors' operations and avoid the significant losses and irreparable harm that would occur if the Debtors were forced to cease operations.  Accordingly, the Debtors believe the relief sought in the Utility Motion is in the best interest of the Debtors' and their estates.

**E.      The Joint Administration Motion**

30.      GCF is a wholly-owned subsidiary of GCF Holdings and GCF Franchisee shares corporate ownership with GCF and GCF Holdings.  The issues that will be addressed in these bankruptcy cases will be related and overlapping.  Joint administration will not give rise to any conflict of interest among the Debtors' estates.  The rights of the Debtors' respective creditors will not be adversely affected by the proposed joint administration because the Debtors will continue as separate and distinct legal entities and will continue to maintain separate books and

records.   Moreover, each creditor may file its claim against a particular estate.   Each of the

Debtors will file separate Schedules of Assets and Liabilities and Statements of Financial

Affairs.   Accordingly, I believe the relief requested in the Joint Administration Motion is in the

best interest of the Debtors and their estates.

**F.      The Wage Motion**

31.      Prior to the Petition Date and in the ordinary course of its business, the Debtors

paid employees' wages, salaries, and other compensation and benefits.   As employee obligations

accrue on an ongoing and continuous basis, but are paid periodically, the intervening bankruptcy

filing has resulted in the accrual of unpaid pre-petition wages, salaries, and commissions, and/or

other compensation owed to employees and related third-parties.   By the Wage Motion, the

Debtors seek authority to pay certain pre-petition obligations owing to its employees, including,

but not limited to:   (i) amounts owed to employees for wages and expense reimbursement; (ii)

maintenance of employee health and benefit plans; (iii) reimbursement of employee expenses;

and (iv) other miscellaneous employee expenses and benefits (collectively, the "Prepetition

Employee Obligations").   The Debtors request authority to pay Prepetition Employee

Obligations in an amount not to exceed $700,000.00.

32.      To maintain the continuity of the Debtors' business operations and to preserve the

morale of employees, it is important that the Debtors be permitted to pay the Prepetition

Employee Obligations at their discretion in the ordinary course of business.   The continued

loyalty of a debtor's employees is a necessary component to any successful Chapter 11 case.

The filing of a Chapter 11 petition is a stressful and uncertain time for a debtor's employees and

such stress and uncertainty often cause poor employee morale at a time when a debtor needs its

employees to be most loyal.   If employees do not receive payment for work performed

prepetition, it is likely that the Debtors will lose a significant number of employees with little or

no notice.  Moreover, many of the Debtors' employees live paycheck to paycheck and would suffer severe adverse consequences if they failed to receive their full compensation.  Likewise, the Debtors would suffer immediate and irreparable harm as a result of any resulting loss of morale, exodus of employees, and disruption to its operations.  Honoring the Debtors' Prepetition Employee Obligations will minimize the hardship that employees will certainly endure if payroll is interrupted and will prevent the wholesale loss of employees that would ensue if the employees lost the reasonable expectation that they will be paid for their work.

33.    Accordingly, in the exercise of my business judgment I believe that it is in the best interest of the Debtors' estates to pay the Prepetition Employee Obligations as set forth in the Wage Motion in the ordinary course of business.

**G.    The DIP Motion**

34.    GCF has an urgent and immediate need for cash to continue to operate.[5] Currently, GCF does not have sufficient funds to operate without an overadvance under its prepetition credit facility.  Absent authorization from the Court to obtain additional financing, GCF will be forced to immediately cease operations and liquidate its assets, not only destroying its going-concern value but also resulting in the loss of approximately 500 jobs at the Debtors' headquarters in Plover, Wisconsin.  GCF intends to file a motion (the "Bid Procedures Motion") to request the entry of an order establishing procedures for a competitive bidding and auction process for the sale of substantially all of the assets of GCF.  The Bid Procedures Motion contemplates that a sale of GCF's assets will be consummated no later than July 14, 2015. Without additional financing, GCF will be unable to operate long enough to consummate the sale.

---

[5] GCF Holdings is a non-operating holding company that owns the equity in GCF.  Although GCF Holdings does not operate, for the reasons discussed below it is a guarantor under the proposed DIP Loan Agreement (defined below).

35.     The debtor-in-possession financing requested in this Motion will enable GCF to continue operating through the closing of the proposed sale, maximizing the value of GCF's estate by preserving GCF's value as a going concern.   The DIP Financing will permit GCF to continue operating until at least July 14, 2015, by which time GCF will have closed on the sale of its assets to the highest bidder.   Without the DIP Financing, the GCF will not be able to operate long enough to conclude the sale, and will be forced to cease its operations and convert this case to chapter 7.

36.     Approval of the DIP Financing on the terms set forth in the DIP Loan Agreement will provide GCF with immediate access to funds necessary to pay current and ongoing operating expenses, including postpetition wages, utility payments, and payments to vendors. Without access to sufficient funds to pay these costs, GCF will be forced to immediately cease operations and terminate all of its employees, destroying the GCF's value as a going concern and severely harming GCF's approximately 500 employees.   The DIP Financing is necessary in order to preserve the value of the Debtors' estates and to avoid the harm that would result from the termination and piecemeal liquidation of GCF's operations.

37.     As set forth above, the Debtors have not been able to obtain unsecured credit or DIP financing on better terms than those reflected in the DIP Loan Agreement.   Further, the DIP Financing is necessary to preserve the going-concern value of the Debtors' estates because, absent additional financing, GCF will be forced to cease operations and liquidate its assets in piecemeal fashion.   Finally, the terms of the DIP Financing were negotiated at arms' length and are fair and reasonable under the circumstances.   Having been turned down by at least 27 potential sources of financing, the Debtors do not believe that there are any parties willing to provide financing on terms more favorable than those contained in the DIP Loan Agreement,

including financing in the form of unsecured credit allowable under section 503(b)(1) or as an administrative expense under section 364(a) or (b).

38.    GCF does not currently have sufficient cash flow or liquidity to fund its operations and the Debtors have not been able to obtain DIP financing on more favorable terms. After several weeks of arms' length negotiation with the DIP Lender, the Debtors believe in the exercise of their business judgment that the terms of the DIP Financing, including the roll-up of the DIP Lender's prepetition claim, are fair and reasonable and are the most favorable terms the Debtors could obtain under the circumstances.

39.    GCF does not have sufficient funds with which to operate its business on an ongoing basis and, specifically, to meet postpetition operating expenses, including payroll obligations on May 22, 2015.  Absent immediate authorization from the Court to obtain secured credit on an interim basis, the GCF will be forced to cease operations.  Expedited consideration of the Motion and interim approval of the DIP Financing will enable GCF to continue operations pending the Final Hearing, preventing the immediate and irreparable harm that would occur if GCF were unable to continue operating.  Accordingly, the interim relief requested in the DIP Motion is critical to preserving and maintaining the Debtors' value as a going concern.

40.    For the foregoing reasons, the Debtors believe that the relief requested in the DIP Motion is in the best interest of the Debtors' and their estates.

41.    I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 18, 2015              */s/James J. Bradford*              
                                              James J. Bradford