## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| **GOLDEN COUNTY FOODS, INC.,** | § | CASE NO. 15-11062 |
| ***et al.,***[1] | § | |
| | § | JOINTLY ADMINISTERED |
| **DEBTORS** | § | |

---

### DEBTORS' MOTION FOR ENTRY OF ORDERS (I) APPROVING BIDDING PROCEDURES, SCHEDULING AN AUCTION, AND A SALE HEARING, AND (II) GRANTING RELATED RELIEF

Golden County Foods, Inc. ("GCF"), GCF Holdings II, Inc. ("GCF Holdings"), and GCF Franchisee, Inc. ("GCF Franchisee") (collective the "Debtors"), as debtors and debtors-in-possession, file this motion (the "Motion") for entry of orders (i) approving bidding procedures and scheduling an auction for the sale of substantially all of the assets of GCF (the "Purchased Assets") to Monogram Appetizers, LLC ("Monogram" or the "Stalking Horse Bidder") free and clear of all interests under section 363 of the Bankruptcy Code,[2] and (ii) granting certain related relief, and in support states as follows:

## I. BACKGROUND

1.      On May 15, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their property and are operating their businesses as debtors-in-possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.  A detailed description of the Debtors' business, capital

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Golden County Foods, Inc. (3018); GCF Franchisee, Inc. (4385); and GCF Holdings II, Inc. (3151).  The address of the Debtors' corporate headquarters is 300 Moore Road, Plover, Wisconsin 54467.

[2] 11 U.S.C. § 101, *et seq.*  Unless otherwise noted, all statutory references are to the Bankruptcy Code.

structure, and the events leading to the Debtors' bankruptcy is set forth in the Declaration of James J. Bradford (the "First Day Declaration") and is incorporated herein by reference.

## II. PRELIMINARY STATEMENT

2.      As set forth more fully in the First Day Declaration, the Debtors have been in financial distress since late 2013. The Debtors' financial problems were caused by, among other things, unprofitable contracts, high labor costs, and customer-driven issues that lead to a severe restriction in liquidity. The Debtors are in default with their senior secured lender and are unable to pay their operating expenses as they come due. Absent additional financing or a sale of its assets, the Debtors will be forced to immediately cease operations and liquidate. In addition to destroying the Debtors' value as a going concern, liquidation would result in the loss of nearly 500 jobs in Plover, Wisconsin, where Golden County Foods has been headquartered for nearly 25 years.

3.      In an effort to avoid liquidation and preserve their value as a going concern, the Debtors began seeking additional financing in February 2015. However, as a result of the Debtors' precarious financial condition, they have been unable to obtain additional financing. Accordingly, the Debtors marketed the Purchased Assets for sale. After a three-month marketing and sale process, the Debtors have reached an agreement with Monogram for the purchase and sale of the Purchased Assets (i.e., substantially all of the assets of Golden County Foods, Inc.) under the terms of an Asset Purchase Agreement (the "APA"), attached hereto as **Exhibit A**. The APA provides for the sale of the Purchased Assets as a going concern free and clear of all liens, claims, and interests under section 363 of the Bankruptcy Code for a purchase price of $22 million to be paid at closing plus certain assumed liabilities[3] as set forth in the APA

---

[3] Monogram will pay certain cure costs associated with contracts that it assumes under the APA.

(the "Stalking Horse Purchase Price") subject to higher and better bids.  The sale will enable the Debtors to avoid immediate liquidation and preserve hundreds of jobs while returning significant value to the Debtors' creditors.

4.      While the APA reflects the highest offer the Debtors received prepetition, the Debtors believe that a competitive sale process will ensure that the Debtors receive the highest possible price for the Purchased Assets.  Accordingly, the Debtors seek entry of an order (i) approving Monogram as the Stalking Horse Bidder on the terms set forth below; (ii) approving the bid procedures discussed below and set forth in **Exhibit B**, including the proposed break-up fee (the "Break-Up Fee") to the Stalking Horse Bidder; (iv) approving the procedures and notices attached hereto as **Exhibits C and D**; and (v) scheduling an auction (the "Auction") and final sale hearing (the "Sale Hearing").

5.      The Debtors have filed a Motion for the Entry of Interim and Final Orders Authorizing Debtor-in-Possession Financing (the "DIP Motion"), seeking sufficient debtor-in-possession financing ("DIP Financing") from PNC Bank, N.A. ("PNC") to enable the Debtors to continue operating long enough to consummate the sale.  Without the DIP Financing, the Debtors would be unable to consummate the sale and would be forced to immediately convert this case to chapter 7.  As set forth more fully in the DIP Motion, the DIP Financing will expire on July 14, 2015 (the 60th day after the Petition Date), at which time the Debtors must have closed on the sale of the Purchased Assets in order to avoid an event of default under the DIP Financing agreements.   Accordingly, the bidding and sale procedures set forth below contemplate an expedited sale process that will be concluded within this 60 day period.

### III. PREPETITION MARKETING EFFORTS

6.      In December 2014, the Debtors began approaching potential sources of financing seeking additional capital, including additional financing, to ensure that the Debtors could continue as a going concern. However, the Debtors were unable to obtain any additional capital or financing.  Accordingly, the Debtors retained Piper Jaffray & Co. ("Piper Jaffray") to advise the Debtors with respect to its strategic alternatives and to assist the Debtors with the marketing and sale of the Debtor's assets on a going-concern basis.  Among other things, Piper Jaffray has assisted the Debtors in (a) drafting an offering document describing Debtors, its operations, historical performance and future prospects; (b) identifying, contacting and screening potential purchasers of the Debtors' assets or business; (c) contacting such potential purchasers; (d) preparing a due diligence data room and coordinating the due diligence investigations of potential purchasers; (e) analyzing proposals received from potential purchasers; and (f) negotiating the financial aspects of the proposed sale transaction.

7.      Piper Jaffray began the marketing process in February 2015 by contacting 128 parties to discuss the possibility of refinancing or purchasing the Debtors' assets, 27 of which were potential sources of financing and 101 of which were potential purchasers.  63 of those contacted executed a non-disclosure agreement and received a memorandum describing the Debtors' business and the prospective opportunity.  51 of the 63 were potential purchasers while the remaining 12 were potential sources of financing.  Of those parties, six returned initial indications of interest expressing interest in purchasing the Purchased Assets.  No parties expressed interest in a refinancing.

8.      Of the six initial indications of interest, the highest offer was submitted by Monogram, a Memphis-based food manufacturer and co-packager who seeks to acquire the

Purchased Assets and integrate the Debtors' operations into its own. Monogram conducted due diligence in late March and throughout the month of April. After approximately a month of intensive negotiation and due diligence, the Debtors and Monogram reached an agreement for the sale of the Purchased Assets, which was memorialized in the APA attached hereto as **Exhibit A**. After negotiating and finalizing the APA, the Debtors initiated this chapter 11 proceeding to consummate the sale under section 363, subject to any higher and better offers received in the context of a competitive bidding and auction process.

## IV. PROPOSED SALE AND BIDDING PROCEDURES

**A.    Overview of Sale and Proposed Sale Process**

9.    As set forth above, the APA provides for the sale of the Purchased Assets to the Stalking Horse Bidder for the Stalking Horse Purchase Price (i.e. $22 million plus certain assumed liabilities), subject to higher and better bids received in a competitive sale process, under section 363(b) of the Bankruptcy Code. There are two primary contingencies to closing in the APA. First, Monogram's obligation to close is subject to securing a new contract with a major customer on terms satisfactory to Monogram. Discussions between Monogram and this customer are ongoing and the Debtors believe that this condition will be satisfied prior to the proposed Bid Deadline (defined below).

10.    Second, closing is conditioned on the termination of the Collective Bargaining Agreement (the "CBA") between the Debtors and United Foods and Commercial Workers, Local 1473 (the "Union"). Monogram has concluded that it is not viable to assume the Debtors' obligations under the CBA, and no other purchaser has been willing to make a binding offer that would result in the assumption of the CBA. Therefore, termination of the CBA is necessary to enable the Debtors to consummate the sale of its assets and avoid a chapter 7 liquidation. If the

Debtors and the Union cannot reach an agreement on the termination of the CBA, the Debtors will seek an order under section 1113 of the Bankruptcy Code terminating the CBA. Absent termination of the CBA, the Debtors will be unable to consummate the sale and will be forced to liquidate. Given the necessity to complete the sale within 60 days of the Petition Date, the Debtors are seeking approval of the sale concurrently with its efforts to terminate the CBA.

11.     In general, the Debtors propose the following bidding and sale procedures. Prior to the hearing on the proposed bidding procedures, Piper will notify various potential purchasers that the Debtors are seeking to sell the Purchased Assets pursuant to section 363 of the Bankruptcy Code and inform them of the proposed bidding and sale process. Upon approval of the bidding procedures discussed below, the Debtors will provide notice of the bidding procedures, auction date, deadline to object to the proposed sale, and sale hearing. If the Debtors receive any qualified bids (as described below) on better terms than those in the APA, the Debtors will hold an auction at which qualified bidders will be invited to bid on the Debtors' assets, subject to the Stalking Horse Bidder's bid and the Break-Up Fee. After the auction, the Debtors, in consultation with PNC and the Committee (defined below), will choose the highest and best bid, in their sole discretion, and will seek approval to sell the Purchased Assets to the highest bidder at the final sale hearing. If the Debtors receive no additional qualified bids, the Debtors will so advise the Court and seek approval to sell the Purchased Assets to the Stalking Horse Bidder pursuant to the APA at the final sale hearing.

12.     The Debtors believe that the procedures proposed in this Motion will guarantee that the Debtors receive the highest possible price for the Purchased Assets under the circumstances. Even with the proposed DIP Financing, the Debtors will run out of cash and be forced to cease operations and liquidate by mid-to-late July. In short, the Debtors currently have

but two options: complete the sale of the Purchased Assets to the highest bidder within 60 days or convert to chapter 7 and liquidate their assets in piecemeal fashion. The procedures set forth in this Motion are intended to maximize the value of the Debtors' assets while accomplishing a sale as expeditiously as possible.

## B.    The Proposed Notice and Bidding Procedures[4]

13.    The Debtors propose the following notice and bidding procedures, which they believe will generate the highest possible value for the Purchased Assets under the circumstances. The Debtors request entry of an order in the form attached hereto as **Exhibit B** (the "Bidding Procedures Order") approving these procedures (the "Bidding Procedures"), approving the form of notices attached hereto as **Exhibit C** (the "Notice of Auction and Sale Hearing") and **Exhibit D** (the "Cure Notice"). The notice and bidding procedures are as follows:[5]

a.    **Notice.** Within three (3) business days after the entry of the Bidding Procedures Order, the Debtors will serve the Notice of Auction and Hearing, which contains the time and place of the Auction, the time and place of the Sale Hearing, and the Objection Deadline, to (i) the Office of the United States Trustee; (ii) the Internal Revenue Service; (iii) all applicable federal, state, and local taxing authorities having jurisdiction over the Purchased Assets; (iv) counterparties to the Debtors' executory contracts (the "Counterparties"); (v) all parties who are known to possess or assert a secured claim or other interest in or against any of the Purchased Assets; (vi) the Union and its counsel; (vii) all parties to any pension plan or collective bargaining agreement maintained, sponsored, or contributed to by any of the Debtors; (viii) counsel for any official committee of unsecured creditors (the "Committee") appointed in this case; (ix) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (x) any other parties known by the Debtors to have expressed an interest in purchasing some or all of the Debtors' assets; (xi) all parties to any governmental approvals or permits; (xii) any applicable state or federal environmental agency; (xiii) the state attorney generals in any State in which any Debtor has operations; (xiv) the United States

---

[4] In the event of any inconsistencies between the description of the Bidding Procedures contained in this Motion and the language of the Bidding Procedures themselves, the language of the Bidding Procedures Order shall govern.

[5] The provisions referenced in Local Rule 6004-1(c) are highlighted.

---

Attorney for the District of Delaware; and (xv) the Pension Benefit Guaranty Corporation (collectively, the "Notice Parties").  After the Petition Date, Piper Jaffray will continue its marketing efforts and will provide the Notice of Auction and Hearing to parties Piper Jaffray contacted in its marketing efforts between the Petition Date and the Bid Deadline (defined below).

b.    **Participation Requirements**.  In order to participate in the bidding process, a person interested in acquiring the Purchased Assets (a "Potential Bidder") must first deliver to (i) the Debtors, c/o their counsel, Patrick J. Neligan Jr. & John D. Gaither, Neligan Foley LLP, 325 N. St. Paul, Suite 3600, Dallas, TX 75201, pneligan@neliganlaw.com, jgaither@neliganlaw.com and Mark D. Collins, Richards, Layton & Finger, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, collins@rlf.com; (ii) Piper Jaffray, c/o Teri Stratton and Matt Roghair, 2321 Rosecrans Avenue, Suite 3200, El Segundo, CA 90245, teri.l.stratton@pjc.com; (iii) the Stalking Horse Bidder, c/o its counsel, David Cocke, Evans Petree PC,  1000 Ridgeway Loop Road, Suite 200, Memphis Tn., 38120, dcocke@evanspetree.com and Robert Dehney and Curtis S. Miller, Morris, Nichols, Arsht & Tunnel LLP, 1201 North Market Street, 16th Floor,    Wilmington,    Delaware    19899-1347,    rdehney@mnat.com, cmiller@mnat.com; (iv) PNC Bank, N.A., c/o its counsel, Robert W. Jones, 200 Crescent Court, Suite 1600, Dallas, Texas 75201, robert.jones@hklaw.com and Regina Stango Kelbon, 1201 Market Street, Suite 800, Wilmington, DE 19801, kelbon@blankrome.com; and (v) the Committee, if any, and its counsel (the "Sale Notice Parties").

(i)    Confidentiality Agreement.  An executed confidentiality agreement in form and substance acceptable to Seller, PNC, and the Committee, if any, and its counsel; and

(ii)    Identification of Potential Bidder.  Identification of the Potential Bidder and any Principals (as defined below), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the auction and the contemplated transaction.

Upon receipt of the documents and information required by subparagraphs (b)(i) and (ii) above, the Debtors, in consultation with PNC and the Committee (if any), will determine whether a bidder is reasonably likely to be able to fund and complete the consummation of a proposed transaction on terms no less favorable in the aggregate than the terms contained in the APA.  As promptly as reasonably possible, the Debtors will determine and notify the interested person or entity if such person or entity is acceptable and deem such person or entity a "Potential Bidder."

c.    **Qualified Bidder**.  A "Qualified Bidder" is a Potential Bidder that:

(i)    delivers the documents described in subparagraph (a) above;

(ii)    delivers written evidence satisfactory to the Debtors, in consultation with PNC, and the Committee, if any, that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction without delay, including:

(a)    current financial statements (audited if they exist);

(b)    contact names and numbers for verification of financing sources; and

(c)    evidence of internal resources and proof of any underwritten debt or equity funding commitments that are needed to close the contemplated transaction; and

(iii)    The Debtors determine are reasonably likely to submit a *bona fide* offer that (standing on its own or in combination with one or more other offers) would result in greater total consideration being received for the benefit of the Debtors' creditors than under the APA and be able to promptly (and no later than 60 days after the Petition Date) consummate a sale if selected as a Successful Bidder as defined below).

Upon the receipt from a Potential Bidder of the information required under subparagraphs (i)-(iii) above, Seller, as soon as is practicable, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

The Stalking Horse Bidder is a Qualified Bidder.

d.    **Access to Due Diligence Materials**.  Only Potential Bidders that comply with the participation requirements set forth above are eligible to receive due diligence access or additional non-public information, subject to reasonable competitive and other business concerns.  If the Debtors, in consultation with PNC and the Committee, if any, determines that a Potential Bidder that has satisfied the participation requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence information or additional non-public information shall terminate.  The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below).

e.    **Due Diligence From Bidders**.  Each Potential Bidder and Qualified Bidder (each, a "Bidder") shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction.  Failure by a Potential Bidder to comply with the requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder.  Failure by a Qualified Bidder to timely comply with requests for

additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

f.    **Bidding Process.**  The Debtors, and their advisors, in consultation with PNC and the Committee, if any, shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions above; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Purchased Assets (collectively, the "Bidding Process").  Subject to approval by the Stalking Horse Bidder, in its sole discretion, the Debtors shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions of the Bid Procedures or of any Bankruptcy Court order.

g.    **Bid Deadline**.  A Potential Bidder that desires to make a proposal must deliver written copies of its proposal to the Sale Notice Parties no later than June 29, 2015 (the "Bid Deadline").  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

h.    **Bid Requirements**

    (a)    To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by Seller to satisfy each of the following conditions:

        (i)    Required Deposit: Each Bid must be accompanied by a deposit (the "Required Deposit") by wire transfer to an escrow agent selected by the Debtor in an amount of $500,000.  The Stalking Horse Bidder shall provide the Required Deposit on or before two days prior to the Auction.

        (ii)    Minimum Overbid:  The minimum initial overbid shall exceed the Monogram Purchase Price by a total value of $750,000.  Any subsequent overbids must be in increments of at least $100,000 in cash consideration (which amount the Debtors, in their reasonable business judgment, in consultation with PNC and the Committee (if any), may modify at the Auction) until the Debtors declare a Successful Bidder.

        (iii)    Irrevocable:  A Bid must be irrevocable until two (2) business days after the Purchased Assets have been sold pursuant to the Closing of the sale approved by the Bankruptcy Court (the "Termination Date") and must be in the form of an asset purchase agreement signed by the

Qualified Bidder, provided, however, that the Stalking Horse Bidder shall not be required to be a Back-Up Bidder if it is not the Successful Bidder at the Auction.

(iv) <u>As is Where is</u>:  Provides for the purchase of all or some portion of the Purchased Assets by the Potential Bidder on an "as is, where is" basis

(v) <u>The Same or Better Terms</u>:  The Bid shall propose a contemplated transaction involving substantially all the Purchased Assets and Assumed Liabilities under the APA, and shall contain substantially all of the material terms and conditions contained in the APA, provided, however, that any variations from one or more material terms (including, but not limited to, an offer to purchase less than substantially all the Bid Assets) must, in the aggregate constitute an improvement, as determined by the Debtors, with consultation with PNC and the Committee, if any, upon such term or terms as set forth in the APA.  The Bid must be on terms that, in the Debtors' business judgment, upon consultation with PNC and the Committee, if any, are better than the terms of the APA plus the overbid requirements of paragraph (h)(ii), taking into account the quality and type of consideration being offered and the certainty of performing and closing in a timely manner.  A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "<u>Contemplated Transaction Documents</u>").  A Bid shall include copies of the Bidder's asset purchase agreement and the proposed Sale Order marked to show all changes requested by the Bidder (including those related to Purchase Price) and a list of all contracts and leases proposed to be assumed and assigned.  The Contemplated Transaction Documents must include a written commitment satisfactory to the Debtors of the Bidder's financial ability and intention to promptly complete the transaction without delay and contain a representation that the Qualified Bidder shall make all necessary regulatory filings, if any, and pay all costs and expenses of such filings (including Seller's costs and expenses).

(vi) Either (a) provides for rejection of the CBA, (b) provides for assumption and assignment of the CBA and is not contingent upon any modifications or alterations to the Debtors' obligations under the CBA or, (c) to the extent a

bid requires any modifications or alterations to such obligations (but does not reject the CBA in its entirety), is accompanied by a signed, binding agreement with the Union providing for such modifications or alterations;

(vii)    A Bid may not be conditioned on obtaining financing or any corporate, regulatory, stockholder or internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Asset Purchase Agreement.

(viii)   Includes a designation of contracts and/or leases to be assumed and assigned to the Potential Bidder and evidence of the Potential Bidder's ability to perform future obligations under such agreements;

(ix)     Corporate Authority:  A Bid must include written evidence of the Qualified Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that if the Qualified Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to Seller of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "Principals").

(x)      Financing Sources.  A Bid must contain written evidence satisfactory to Seller that demonstrates the Qualified Bidder has the necessary financial ability to close the contemplated transaction without delay (and no later than 60 days after the Petition Date) and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction.    Such information should include, *inter alia*, the following:

(a)      the Qualified Bidder's current financial statements (audited if they exist);

(b)      contact names and numbers for verification of financing sources;

(c)      evidence of the Qualified Bidder's internal resources and proof of any underwritten debt or equity funding commitments that are needed to close the contemplated transaction; and

(d)      any such other form of financial disclosure or credit quality support information or enhancement reasonably acceptable to or requested by Seller demonstrating that such Qualified Bidder has the ability to close the contemplated transaction without delay; provided, however, that Seller shall determine, in its reasonable discretion, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Qualified Bidder's financial qualifications.

(b)    <u>No Fees Payable to Qualified Bidder</u>: Other than the Qualified Bid of the Stalking Horse Bidder, a Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 related in any way to the submission of its Bid or the Bidding Procedures.

(c)    <u>Stalking Horse Protections</u>: A Bid must provide for the payment of the Stalking Horse Protections by such Qualified Bidder. The Stalking Horse Bidder shall not be required to pay for or provide any Stalking Horse Protections.

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid Deadline requirement above, shall constitute a "<u>Qualified Bid</u>" if the Debtors believe, in their reasonable discretion, upon consultation with PNC and the Committee, if any, that such Bid would be consummated if selected as a Successful Bid (as defined below). For purposes hereof, the APA is a Qualified Bid.

Each Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Purchased Assets that are the subject of the Auction prior to making any such bids; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or

otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder(s), the asset purchase agreement(s) with such Successful Bidder(s).

In the event that any Bid is determined by the Debtors not to be a Qualified Bid, the Qualified Bidder shall be refunded its Required Deposit within three (3) business days after such determination.

a. **PNC Credit Bid**. PNC has agreed not to credit bid obligations relating to Revolving Advances or the First Out Term Loan under the DIP Credit Agreement or the Pre-Petition Credit Agreement if a Qualified Bid (including the Qualified Bid submitted by the Stalking Horse Bidder under the APA) provides for payment in cash, at closing (and no later than sixty (60) days after the Petition Date), for application to the DIP Credit Agreement obligations and Pre-Petition Credit Agreement obligations, an amount equal to the greater of: (i) twenty-two million dollars ($22,000,000); or (ii) an amount sufficient to fully satisfy, in cash, all obligations under the DIP Credit Agreement and Pre-Petition Credit Agreement other than Last Out Term Loan obligations.

Notwithstanding the foregoing, at the direction of Brazos PNC may credit bid all amounts due under the Prepetition Credit Agreement, DIP Credit Agreement including all Revolving Advances and First Out Term Loan, any other amounts due under other documents, and the Last Out Term Loan provided that PNC, as agent and lender under the Senior Secured Superpriority Debtor-in-Possession Revolving Credit, Term Loan and Security Agreement (the "DIP Credit Agreement"), and as agent and lender under the pre-petition Revolving Credit, Term Loan and Security Agreement dated as of November 13, 2013 (the "Pre-Petition Credit Agreement"), or its designee shall be entitled to credit bid all or a portion of the outstanding Last Out Term Loan obligations under the DIP Credit Agreement and the Pre-Petition Credit Agreement in accordance with section 363(k) of the Bankruptcy Code (a "Brazos Credit Bid"); provided, however, that any such Brazos Credit Bid must include a purchase offer by Brazos Equity Fund II, L.P. (or its assignee) for substantially all of the Purchased Assets that provides for payment in full, in cash, of (i) all Obligations under the DIP Credit Agreement, Prepetition Credit Agreement, Other Documents (other than Last Out Term Loan Obligations) (as those terms are defined in the DIP Credit Agreement) and (ii) the Break-Up Fee and Expense Reimbursement on the date of the sale closing.

PNC is deemed to be a "Qualified Bidder" for purposes of submitting a bid in accordance with the terms herein and any such bid shall be deemed to be a "Qualified Bid" for all purposes herein.

i. **No Qualified Bids**. If no Qualified Bids are received, the Debtors shall report the same to the Court and declare the Auction a "failed auction" and will seek

final approval of the sale to the Stalking Horse Bidder under the APA at the Sale Hearing.

j.  **Auction Procedure**.  If at least one Qualified Bid other than the Stalking Horse Bidder's bid is received, the Debtors shall conduct the Auction on July 1, 2015, at Richards, Layton & Finger, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 at 9:00 a.m. (EST), or such later time or other place as the Debtors shall notify all Qualified Bidders.  Only Qualified Bidders shall be eligible to participate in the Auction.  The Debtors shall not consider a particular bid unless (i) the bidding party has submitted a Qualified Bid, (ii) the Qualified Bidder attends the Auction, and (iii) the Qualified Bidder's representative at the Auction has authority to bind the Qualified Bidder.

Prior to the start of the Auction, the Debtors, in consultation with PNC and the Committee (if any), shall evaluate all Qualified Bids, as well as the Stalking Horse Bidder's bid and the APA, and shall determine which Qualified Bid constitutes the best offer for the Purchased Assets (the "Starting Auction Bid"). The Debtors shall announce the Starting Auction Bid at the start of the Auction. The Debtors shall provide the Stalking Horse Bidder and all Qualified Bidders with copies of all Qualified Bids at least 1 business day prior to the Auction.

The Debtors, in consultation with PNC and the Committee (if any), may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent Qualified Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Bidding Procedures, or any order of the Court, and (ii) disclosed to each Qualified Bidder at the Auction.

The Debtor shall announce at the Auction the material terms of each overbid, the basis for calculating the total consideration offered in each such overbid.

k.  **Minimum Overbids**.  The minimum initial overbid shall exceed the Monogram Purchase Price by a total value of $800,000.  Any subsequent overbids must be in increments of at least $100,000 in cash consideration (which amount the Debtors, in their reasonable business judgment, in consultation with PNC and the Committee (if any), may modify at the Auction) until the Debtors declare a Successful Bidder.

l.  **Successful Bidder**.  At the conclusion of the Auction, the Debtors, in consultation with PNC and the Committee (if any), shall (i) review the Stalking Horse Bidder's APA or any Qualified Bid of the Stalking Horse Bidder, and shall review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale, including those factors affecting the speed and certainty of consummation of the Qualified Bid and (ii) identify the best bid (the "Successful Bid") and the bidder making such bid (the "Successful Bidder"). In determining the Successful Bidder, the Debtors shall consider the Break-Up Fee and Expense Reimbursement.

If at least one Qualified Bid in addition to the Stalking Horse Bidder's Qualified Bid is received, then, at the Sale Hearing, the Debtors will seek approval of the Successful Bid, and, at the Debtor's election, may also seek approval of the next best Qualified Bid (the "Alternate Bid" and, the bidder making such Alternate Bid, the "Alternate Bidder"), provided, however, that the Stalking Horse Purchaser may be permitted to be, but shall not be required to remain, an Alternate Bidder. The Debtors' presentation to the Court of the Successful Bid and, if applicable, the Alternate Bid will not constitute the Debtors' acceptance of such Qualified Bids until such Qualified Bids are approved by the Court at the Sale Hearing. Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Alternate Bid, if one is selected, will be deemed to be the Successful Bid and the Debtors will be authorized, but not directed, to effect the Sale to the Alternate Bidder subject to the terms of the Alternate Bid of such Alternate Bid without further order of the Court. The Alternate Bid shall remain open until the earlier of (a) sixty (60) days following the entry of the Sale Order or (b) the consummation of the Sale to the Successful Bidder.

Within xix (6) hours following the selection of the Successful Bidder, the Debtor will file with the Court a notice of the selection of the Successful Bidder and the Alternate Bidder (the "Auction Notice"), copies of the Successful Bidder's Purchase Agreement and the Alternate Bidder's Purchase Agreement, and affidavits of the Debtors and the Successful Bidder in support of the sale of the Purchased Assets to the Successful Bidder. The Debtors will serve the Auction Notice upon the Notice Parties.

m.   **Break-Up Fee**. The amount of the Break-Up Fee shall be $500,000. In the event the Stalking Horse Bidder is not the Successful Bidder, the Stalking Horse Bidder shall be entitled to payment of the Break-Up Fee from the proceeds of the sale of the Purchased Assets in accordance with the APA. If the Successful Bid includes a credit bid, the credit bid shall include a cash component for the payment of the Break-Up Fee. The Debtors' obligation to pay the Break-Up Fee pursuant to the terms of these Bidding Procedures and the APA shall survive termination of the APA, dismissal or conversion of the Chapter 11 Case, and confirmation of any plan of reorganization or liquidation, and shall constitute an administrative expense of the Debtors under sections 503(b) and 507(a).

n.   **Expense Reimbursement**. In the event the Stalking Horse Bidder is not the Successful Bidder, the Stalking Horse Bidder shall be entitled to an expense reimbursement of documented expenses of up to $150,000 (the "Expense Reimbursement"). The Stalking Horse Bidder shall be entitled to payment of the Expense Reimbursement from the proceeds of the sale of the Purchased Assets in accordance with the APA. If the Successful Bid includes a credit bid, the credit bid shall include a cash component for the payment of the Expense Reimbursement. The Debtors' obligation to pay the Expense Reimbursement pursuant to these Bidding Procedures and the APA shall survive termination of

the APA, dismissal or conversion of the Chapter 11 Case, and confirmation of any plan of reorganization or liquidation, and shall constitute an administrative expense of the Debtors under sections 503(b) and 507(a).

o.  **Objections.** The Notice of Auction and Sale Hearing will specify that objections to the relief requested by this Motion, including objections relating to the assumption or assignment of any unexpired lease or executory contract, shall be set forth in writing and specify with particularity the grounds for such objections or other statements of position, and shall be filed and served on or before the date that is seven (7) days prior to the Sale Hearing (the "Objection Deadline"), on: (i) the Debtors, c/o their counsel, Patrick J. Neligan Jr. & John D. Gaither, Neligan Foley LLP, 325 N. St. Paul, Suite 3600, Dallas, TX 75201, pneligan@neliganlaw.com, jgaither@neliganlaw.com and Mark D. Collins, Richards, Layton & Finger, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, collins@rlf.com; (ii) Piper, c/o Teri Stratton and Matt Roghair, 2321 Rosecrans Avenue, Suite 3200, El Segundo, CA 90245, teri.l.stratton@pjc.com; (iii) the Stalking Horse Bidder, c/o its counsel, David Cocke, Evans Petree PC, 1000 Ridgeway Loop Road, Suite 200, Memphis Tn., 38120, dcocke@evanspetree.com and Robert Denhey and Curtis S. Miller, Morris, Nichols, Arsht & Tunnel LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19899-1347, rdehney@mnat.com, cmiller@mnat.com; (iv) PNC Bank, N.A., c/o its counsel, Robert W. Jones, 200 Crescent Court, Suite 1600, Dallas, Texas 75201, robert.jones@hklaw.com and Regina Stango Kelbon, 1201 Market Street, Suite 800, Wilmington, DE 19801, kelbon@blankrome.com; and (v) the Committee, if any, and its counsel (collectively, the "Objection Service Parties"). The Debtors request that the Court order that the failure to file and serve objections by the Objection Deadline and in accordance with the foregoing procedure shall be deemed a waiver of such objections and the objecting party shall be forever barred from asserting such objections with respect to the consummation and closing of the Sale, including, without limitation, any objections relating to the proposed assumption and assignment of any agreement. The Notice of Auction and Sale Hearing will further state that any objections filed and served in accordance with the foregoing procedure will be heard by the Court at the Sale Hearing.

p.  **Consent to Jurisdiction**. All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the United States Bankruptcy Court for the District of Delaware and waived any right to a jury trial in connection with any disputes relating to the Auction.

q.  **Sale Hearing**. The Debtors request that the Court schedule the Sale Hearing on, or as soon as practicable after, July 1, 2015 at 1:30 p.m., at which the Debtors shall seek entry of the Sale Order, among other things, authorizing and approving the proposed transaction with the Successful Bidder, as determined by the Debtors, and in accordance with the Bidding Procedures, pursuant to the terms and conditions set forth in the Successful Bid.

      r.     **Return of Deposits.**  All Required Deposits, but excluding the Required Deposit of the Successful Bidder and the Alternate Bidder, shall be returned to Qualified Bidders within five (5) business days after the date of the Auction.

## C.    Assumption and Assignment of Executory Contracts and/or Unexpired Leases

14.    In conjunction with the Sale, the Debtors will seek to assume and assign to the Successful Bidder certain agreements identified in the Successful Bid (the "Assigned Contracts").  Within three (3) days after entry of the Bidding Procedures Order, the Debtors shall file and serve upon Counterparties to the Assigned Contracts a notice substantially in the form attached hereto as **Exhibit D** (the "Cure Notice"), informing the counterparties that the Debtors' Assigned Contracts may be assumed and assigned, and setting forth what the Debtors' records show to be the applicable cure amounts, if any (the "Cure Amounts").

15.    All objections to the relief sought at the Sale Hearing, including objections to the Cure Amounts and objections to the proposed assumption and assignment of the Assigned Contracts identified in any bid, must: (i) be in writing; (ii) state with specificity the nature of such objection (with appropriate documentation in support thereof); (iii) comply with the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware; and (iv) be filed with this Court and served upon (so as to be received by) the Objection Service Parties on or before the Objection Deadline.

16.    A party failing to file and serve a timely objection, on or before the Objection Deadline, to the Cure Amounts and/or the Debtors' assumption and assignment of any executory contract or unexpired lease shall be forever barred from objecting to the Cure Amounts and/or assumption and assignment, and will be deemed to consent to the Cure Amounts and/or assumption and assignment.  In the event that timely objection to the Cure Amounts and/or

**Debtor's Motion for Entry of Orders Approving Sale of Assets, Approving
Bidding Procedures, and Granting Related Relief**                    **Page 18**
RLF1 12039707v.1

assumption and assignment of any executory contract or unexpired lease is filed, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such objection will be determined at the Sale Hearing or such other date and time as may be fixed by this Court.

## V. BASIS FOR REQUESTED RELIEF

**A.    The Bidding Procedures Should Be Approved.**

17.    The bidding procedures proposed in this Motion are designed to generate the highest and best bid for the Debtors' assets by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and submit competing Qualified Bids. The procedures provide Potential Bidders with more than the 21 days' notice of the Sale Hearing required by Bankruptcy Rule 2002, and provide Potential Bidders with sufficient opportunity to acquire the information necessary for submission of a timely and informed Qualified Bid.

18.    As set forth above, the Debtors and Piper Jaffray extensively marketed the Purchased Assets prior to the Petition Date, contacting over 100 potential purchasers and conducting substantive negotiations with six parties. Thus, the Debtors do not believe that extensive post-petition marketing will yield any additional interested parties. Further, given that the Debtors cannot operate without the DIP Financing, which terminates on July 14 2015, it is critical that the sale be consummated as expeditiously as possible. In light of the Debtors' prepetition marketing efforts and significant financial exigencies, the Debtors believe that the procedures set forth above and in the Bid Procedures Order will generate the highest and best offer for the Debtors' assets.

**B.    The Break-Up Fee and Expense Reimbursement Should Be Approved.**

19.    The Court should also approve the Break-Up Fee and Expense Reimbursement, which were necessary to induce Monogram into finalizing its offer. To be approved, bidding

incentives, including break-up fees and expense reimbursements, must provide some benefit to a debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999). Courts have identified at least two ways in which bidding incentives may benefit a debtor's estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, if the availability of break-up fees and expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id.*[6]

20.    Here, the Break-Up Fee and Expense Reimbursement are necessary to preserve the value of the Debtors' estate because they were necessary to induce Monogram to complete its due diligence and make an initial bid for the Purchased Assets. The necessity of the Break-Up Fee and Expense Reimbursement is further evidenced by the fact that other potential purchasers requested similar protections and declined to submit bids absent those protections. Further, the Break-Up Fee and Expense Reimbursement has benefited the estate by inducing Monogram's bid, which sets a minimum price at which parties must bid for the Purchased Assets. Finally, the

---

[6] In *O'Brien*, the Court of Appeals identified the following factors as relevant in deciding whether to award a break-up fee, but stopped short of endorsing them as necessary to the courts' analyses in determining whether to approve a break-up fee: (i) the presence of self-dealing or manipulation in negotiating the break-up fee; (ii) whether the fee harms, rather than encourages, bidding; (iii) the reasonableness of the break-up fee relative to the purchase price; (iv) whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction; (v) the ability of the request for a break-up fee to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders; (vi) the correlation of the fee to a maximization of value of the debtor's estate; (vii) the support of the principal secured creditors and creditors' committees of the break-up fee; (viii) the benefits of the safeguards to the debtor's estate; (ix) the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee. 181 F.3d at 536.

---

Break-Up Fee and Expense Reimbursement were negotiated at arms' length and are reasonable. At $500,000, the Break-Up Fee represents approximately 2.2% of the sales price, which is within the range generally approved by courts in other sales transaction. *See, e.g., In re Tama Beef Pckg., Inc.*, 321 B.R. 496, 498 (8th Cir. 2005) (noting that break-up fees generally in range of 1% to 4%); *see also In re Western Nonwovens, Inc.*, Case No. 08-11435 (PJW) (Bankr. D. Del. Jul. 29, 2008) (approving 3.1% break-up fee); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (approving break-up fee of 3.3%); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (approving break-up fee of 3.64%). Similarly, the Debtors submit that capping the Expense Reimbursement at $150,000 is reasonable under the facts of this case. Accordingly, the Debtors believe in the exercise of their business judgment that the Break-Up Fee is reasonable, necessary to induce and promote competitive bidding, and in the best interest of the Debtors' estates.

## VI. NOTICE

21.    Notice of this Motion is being given to the Notice Parties. In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

## VII. CONCLUSION & PRAYER

22.    The Debtors' financial condition and lack of financing alternatives dictate that the sale must be concluded as expeditiously as possible, and in all events prior to July 14, 2015. Otherwise, the Debtors will be forced to cease operations and liquidate their assets. The Debtors believe that Bidding Procedures will assure that there is a fair and transparent sale process and will enable the Debtors to maximize the value of the Purchased Assets by avoiding a cessation of the Debtors' operations and the resulting loss of jobs and value that such cessation would create.

23.    The Debtors request that the Court enter the Bidding Procedures Order substantially in the form attached hereto as **Exhibit B**: (i) approving the Bidding Procedures, (ii) scheduling the Auction and Sale Hearing, (iii) approving the Notice Procedures, (iv) approving the Break-Up Fee; (v) granting certain related relief and such other relief as the Court may deem appropriate.

Dated:  May 22, 2015

Respectfully submitted,

/s/ _____

Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Tyler D. Semmelman (No. 5386)
Joseph C. Barsalona II (No. 6102)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email: collins@rlf.com
        heath@rlf.com
        semmelman@rlf.com
        barsalona@rlf.com

Patrick J. Neligan, Jr.
Texas Bar No. 14866000
pneligan@neliganlaw.com
John D. Gaither
Texas Bar No. 24055516
jgaither@neliganlaw.com

NELIGAN FOLEY LLP
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301

**PROPOSED COUNSEL FOR THE DEBTORS**